## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SOUROTH CHATTERJI, | : | |
| | : | |
| Plaintiff, | : | No. 2:18-cv-00199-CB |
| | : | |
| v. | : | |
| | : | |
| CITY OF PITTSBURGH and LINDA | : | **JURY TRIAL DEMANDED** |
| BARONE, individually, | : | |
| | : | |
| Defendants. | : | |

## AMENDED COMPLAINT

Plaintiff Sourouth Chatterji ("Officer Chatterji") hereby files this Amended Complaint as follows:

## INTRODUCTION

1.      Officer Chatterji is a United States Army veteran who served two tours in Iraq and became employed as a patrol officer with the Pittsburgh Bureau of Police (the "PBP") in 2012.  In 2015, Officer Chatterji was ordered by former Chief of the PBP, Cameron McLay ("Former Chief McLay"), and Chief of Staff Commander Eric Holmes ("Chief of Staff Holmes"), to become part of a work group within the PBP to audit the information technology systems it was utilizing.  Pursuant to that audit, Officer Chatterji reported to Former Chief McLay and Chief of Staff Holmes his good faith understanding that the PBP had paid millions of dollars to B-Three Solutions, Inc. ("B-Three Solutions") for updates and upgrades to its information technology systems that the audit revealed were either not completed or not implemented.

2.      In response to being ordered by Former Chief McLay and Chief of Staff Holmes to audit the PBP's information technology systems, Officer Chatterji was threatened and

intimidated by employees within the PBP and the City of Pittsburgh ("Pittsburgh"), including Assistant Chief Barone (defined *infra*). Assistant Chief Barone told Officer Chatterji that his career with the PBP was over and that "chiefs come and go," referring to Former Chief McLay, and that he would ultimately be the one that suffered for auditing B-Three Solutions. During and after the audit, officers under Assistant Chief Barone's direct control and supervision, and who were knowingly aligned with her, made derogatory and racist remarks about Officer Chatterji that were based on his national origin, Indian, calling him things like "sandn*****," "Haji" and "Muhammed," and telling him that no "brown" person will be promoted to sergeant in the PBP.

3. Officer Chatterji attempted to continue his career with the PBP following the resignation of Former Chief McLay by preparing for and taking the examination for promotion to the rank of sergeant. Despite scoring number one overall among all qualified applicants for that promotion, Officer Chatterji was denied the promotion to which he was entitled in retaliation for the information he reported pursuant to the audit, and to discriminate against him because of his national origin. Assistant Chief Barone stated to colleagues and other staff members of Pittsburgh that Officer Chatterji only scored number one overall because he was "Indian" and thus was given extra credit that "Americans" were not given. She also stated that Officer Chatterji was not promoted because of his lack of understanding of "American ways." Those racially discriminatory comments were made by Assistant Chief Barone to Director Hissrich (defined *infra*), who adopted those statements and acted upon them by not promoting Officer Chatterji because of his national origin.

4. Assistant Chief Barone also initiated a baseless complaint against Officer Chatterji with the Office of Municipal Investigations (OMI") for being ordered to audit B-Three Solutions and her role or relationship with that company when Former Chief McLay resigned.

2

Assistant Chief Barone has since expressly ordered that Officer Chatterji not be promoted to sergeant, citing her baseless investigation as pretext for the reason for denying the promotion. Previously, officers in the PBP—including Assistant Chief Barone—had been promoted despite an ongoing OMI investigation.  There is no current policy in the PBP that functions to bar officers from promotion while under OMI investigation unless there is a record of disciplinary results within the reckoning period.  Officer Chatterji had no such discipline on his record.

5.     Pittsburgh also employs Assistant Chief Barone as the Deputy Director of the Department of Public Safety.  The Department of Public Safety oversees the care, management, administration and supervision of all police affairs of the PBP.  Wendell Hissrich is the Director of the Department of Public Safety ("Director Hissrich").  Together or alone, Assistant Chief Barone and Director Hissrich are the policymakers for the PBP with final authority for all personnel decisions, including promotions, within the PBP.  The acts or edicts of Assistant Chief Barone and/or Director Hissrich represent official policy of the PBP.  At all relevant times, as stated below, Director Hissrich was aware of Assistant Chief Barone's retaliatory and discriminatory conduct against Officer Chatterji, and Director Hissrich either directed such conduct himself or acquiesced in it.

6.     Officer Chatterji brings this action pursuant to 42 U.S.C. § 1983 against Pittsburgh and Assistant Chief Barone (individually) for depriving him of his rights guaranteed by the Fourteenth Amendment of the United States Constitution and Pennsylvania's Whistleblower Law, 43 Pa.C.S.A. § 1421, *et seq*. (the "Whistleblower Law").

## PARTIES

7.     Officer Chatterji resides in the Western District of Pennsylvania.

8.      Pittsburgh is a city of the second class located in the Commonwealth of Pennsylvania.  Pittsburgh operates and maintains the PBP through the Department of Public Safety, which has a principal place of business at 1203 Western Avenue, Pittsburgh, Pennsylvania 15233.  Pittsburgh's Department of Public Safety oversees the care, management, administration and supervision of all police affairs of the PBP, and Director Hissrich, as the Director of the Department of Public Safety, is a policymaker for the PBP with final authority for all personnel decisions within the PBP, including promotions.  Director Hissrich also has final authority to delegate policymaking functions for the PBP, including promotions.

9.      Defendant Linda Barone (interchangeably, "Commander Barone," "Assistant Chief Barone," and/or "Deputy Director Barone") is an adult individual residing in Allegheny County, Pennsylvania.  Assistant Chief Barone is currently employed as the Assistant Chief of the PBP, and as the Deputy Director of the Department of Public Safety.  In her capacity as Assistant Chief of the PBP, Barone is the Assistant Chief of Administration, where she is responsible for computer operations and OMI.   In her capacity as Deputy Director of the Department of Public Safety, Barone is a policymaker for the PBP with final authority for all personnel decisions within the PBP, including promotions.   Assistant Chief Barone was previously employed as a Commander of the PBP.  She is sued in her individual capacity.

**JURISDICTION AND VENUE**

10.      This action is brought pursuant to 42 U.S.C. § 1983 and the Fourteenth Amendment of the United States Constitution.  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(3) and (4).  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

11.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because each claim arose in the Western District of Pennsylvania and because Officer Chatterji resides in this District.

## FACTS

### Background

12.     Officer Chatterji is a United States Army veteran who served two tours in Iraq.

13.     In 2012, Officer Chatterji became employed by the PBP as a patrol officer and served in that capacity at all relevant times.

14.     In early 2015, Officer Chatterji was transferred to the PBP's headquarters to work with Former Chief McLay and Chief of Staff Holmes as part of a work group to explore how the PBP could upgrade its information technology systems.

15.     Officer Chatterji was ordered by Former Chief McLay to become part of this work group to audit the information technology systems being utilized within the PBP, and to report all results of the audit to Former Chief McClay and Chief of Staff Holmes.

16.     As the audit progressed, around October 2015, Former Chief McLay and Chief of Staff Holmes tasked Officer Chatterji with gathering information on a new Report Management System (known as an "RMS System") and an update to the computer-aided dispatch system (known as a "CAD System") being used by the PBP.

17.     Specifically, Former Chief McLay and Chief of Staff Holmes tasked Officer Chatterji with gathering information on RMS and CAD Systems that had been created by TriTech Software Systems, formerly known as Tiburon ("Tiburon").

18.     Former Chief McLay and Chief of Staff Holmes also tasked Officer Chatterji with gathering information on the National Crime Information Center terminal (known as "NCIC")

and the RMS System that was already being used by the PBP, which included an NCIC terminal that had been created by Motorola Premier and an RMS System called the Automated Police Reports System (known as "APRS") that had been created by B-Three Solutions.

19.     The purpose of the audit was two-fold: (i) compare the PBP's current RMS System, APRS by B-Three Solutions, with the Tiburon RMS System, and (ii) compare the PBP's current NCIC terminal, created by Motorola Premier, which worked in conjunction with the APRS, with the upgraded Tiburon CAD System.

20.     The goal was to audit the PBP's information technology systems for areas of improvement in data collection and automation.

21.     Through this audit, Officer Chatterji learned that the updated CAD system (which could be updated for free) had a significantly higher level of functionality than the version that was being used by the PBP, and was compatible with Tiburon's RMS System, which had a significantly higher level of functionality than the RMS System by B-Three Solutions.

22.     Officer Chatterji also learned that the Tiburon RMS System was compliant with the National Incident-Based Reporting System ("NIBRS"), which is an incident-based reporting system used by law enforcement agencies in the United States for collecting and reporting crime data.

23.     Officer Chatterji learned that the APRS by B-Three Solutions was neither NIBRS compliant nor usable for accurate crime data reporting.

24.     Officer Chatterji learned that the Tiburon RMS System not only provided an obviously better cost-point for the PBP, but that it also significantly increased officer safety through automation and interfaced with law enforcement on a national basis.

25.     Officer Chatterji learned that B-Three Solutions' APRS was outdated and likely overpriced compared to industry standards.

26.     Officer Chatterji reported all this information to Former Chief McLay and Chief of Staff Holmes as part of the audit into the PBP's information technology systems.

27.     In response, Former Chief McLay and Chief of Staff Holmes ordered Officer Chatterji to conduct a full internal audit of the information technology systems the PBP was implementing through B-Three Solutions.

28.     The ensuing audit performed by Officer Chatterji uncovered various other deficiencies in the systems that B-Three Solutions had been paid to implement within the PBP.

29.     The audit revealed that the system that B-Three Solutions had implemented for producing documentation for an officer's daily activities (known as "daily activity sheets") was comprised of multiple screen shots only and no source code.

30.     Because there was no source code, an officer's daily activities could not be automated into daily activity sheets.

31.     Because the system implemented by B-Three Solutions for producing daily activity sheets did not have software to make it functional, police officers, detectives and supervisors for the PBP were required to hand write their daily activity sheets which led to errors.

32.     The audit revealed that the PBP paid $110,000 to B-Three Solutions to automate this system in 2014, which was still not functional as of the date of the audit.

33.     Officer Chatterji reported this information to Former Chief McLay and Chief of Staff Holmes, who instructed him to continue auditing B-Three Solutions.

34.     The ongoing audit of B-Three Solutions further revealed that the PBP paid B-Three Solutions in full for numerous other projects that were not in use.

35.     In 2012, the PBP paid B-Three Solutions $150,000 to automate and standardize the chain of custody process for property and evidence seized by the PBP through a system known as "Evidence Barcoding."

36.     Although this project was intended to digitize the evidence process within the PBP, thus eliminating handwritten evidence forms and chains of custody, it was never implemented.

37.     Another such project was for "Case Management Reports," which is a part of the "Case Management" system within the PBP, an off-shoot of which was the "Confidential Report System."

38.     In 2011, the PBP paid B-Three Solutions $75,000 to automate and streamline the "Confidential Report Systems," which would have been used by homicide detectives to confidentially exchange information concerning homicide cases.

39.     Although B-Three Solutions was paid in full for this project, it was never automated, thus requiring police officers, detectives and supervisors to manually input information concerning their investigations instead of utilizing an automated system.

40.     Officer Chatterji learned through the ongoing audit that the PBP was paying B-Three Solutions $300,000 for annual software maintenance which would have been free from a different RMS provider.

41.     Officer Chatterji also learned through the ongoing audit that B-Three Solutions was charging the PBP separately for matters that ordinarily would have been included in a subscription for annual software maintenance.

42.     In total, the investigation revealed that the PBP had paid B-Three Solutions over $1,000,000 for technology upgrades and updates that were either not completed, could have been performed by other companies at much lower cost (if not for free), or were inferior in comparison to industry standards.

43.     Officer Chatterji reported the findings of the audit to Former Chief McLay and Chief of Staff Holmes, who then initiated an investigation through OMI and the Federal Bureau of Investigations (the "FBI").

44.      Through these investigations, it was revealed that federal grant money was being used to pay B-Three Solutions, as opposed to money from Pittsburgh's general fund.

45.     Because federal grant money was used to pay B-Three Solutions, the PBP was required to complete annual reports for the federal government disclosing how the grant money was spent and for what purpose.

46.     These investigations thus revealed that the PBP was reporting in its annual reports that it used federal grant money for projects that were completed by B-Three Solutions when those projects had in fact not been completed.

47.     Around the time that Officer Chatterji, OMI and the FBI were all auditing or investigating B-Three Solutions, Former Chief McLay and Chief of Staff Holmes also hired an outside contractor, Nicole DeMotto ("Contractor DeMotto"), to develop a crime analysis unit using data driven policing practices for the PBP.

48.     While trying to develop the crime analysis unit, Contractor DeMotto reported to Former Chief McLay that the biggest difficulty in developing that unit lay in the underperforming information technology systems at the PBP, most of all APRS.

49.     Because of her prior experience with the information technology systems that the PBP was supposed to be implementing, Former Chief McLay thus similarly tasked Contractor DeMotto with auditing B-Three Solutions.

50.     During her audit, Contractor DeMotto authored numerous reports concerning money that the PBP had paid B-Three Solutions for contracts for upgrades to the information technology systems that were never upgraded.

51.     At that point, suspicions had arisen regarding Commander Barone's relationship with B-Three Solutions and her role in providing B-Three Solutions with a sole source contract in 2006 that allowed it to monopolize the PBP's information technology systems.

52.     Contractor DeMotto—in line with OMI and the FBI—authored reports which were critical of Commander Barone in causing the PBP to pay B-Three Solutions for projects that it had not completed.

53.     At all relevant times, Commander Barone was aware that Officer Chatterji, OMI, the FBI and Contractor DeMotto were auditing or investigating her and B-Three Solutions.

54.     At all relevant times, Director Hissrich was aware that Officer Chatterji, OMI, the FBI and Contractor DeMotto were auditing or investigating Commander Barone and B-Three Solutions.

55.     Director Hissrich at all relevant times updated Assistant Chief Barone on all progressions and findings of the audit of the PBP's information technology systems so that she could respond accordingly in retaliation against Officer Chatterji.

56.     At all relevant times, Commander Barone and Director Hissrich were aware that technology upgrades and updates by B-Three Solutions were either not completed, could have

been performed by other companies at much lower cost (if not for free), or were inferior in comparison to industry standards.

57.     As stated below, following the resignation of Former Chief McClay, Commander Barone was promoted to Assistant Chief of the PBP and Deputy Director of the Department of Public Safety by Director Hissrich.

58.     Assistant Chief Barone terminated the OMI investigation; influenced the PBP to cease its investigation with the FBI; and, required Contractor DeMotto to execute a non-disclosure agreement that prohibited her from discussing or disclosing the findings of her audit of B-Three Solutions.

59.     Deloitte, a professional auditing services company, has since been hired to, and is currently auditing the information technology systems for the PBP, including those systems relating to B-Three Solutions.

60.     Following the B-Three Solutions audit that was authorized by Former Chief McClay and Chief of Staff Holmes, numerous decisionmakers for Pittsburgh admitted the accuracy of Officer Chatterji's results, including Director Hissrich.

61.     Following that audit, Pittsburgh City Council passed a resolution changing the way requests for proposals are received and analyzed, intending not to allow companies like B-Three Solutions to obtain monopolies over Pittsburgh's contracts and services, such as the one that Commander Barone provided to B-Three Solutions.

62.     This change was a direct result of the findings from the audit.

### Threats

63.     Throughout the time that Officer Chatterji was auditing B-Three Solutions, he was subjected to various direct and indirect threats by Commander Barone.

64.     During one meeting, Commander Barone told Officer Chatterji that "if he kept digging into B-Three Solutions, it would lead to his ruin."

65.     Commander Barone also told Officer Chatterji that "chiefs come and go," referring to Former Chief McLay, and that he would ultimately be the one that suffered for investigating B-Three Solutions.

66.     Commander Barone directly or indirectly made similar statements to Director Hissrich about Officer Chatterji, who acknowledged and agreed with those statements, and then assisted Commander Barone by updating her throughout the audit so that she could maliciously respond to Officer Chatterji's part in the audit.

67.     On numerous occasions, officers under Commander Barone's direct control and supervision and who were aligned with Commander Barone, including Officer Dawn Bowen ("Officer Bowen") and Sergeant Anthony Cortopassi ("Sergeant Cortopassi"), intimidated and pressured Officer Chatterji to terminate the audit on her behalf.

68.     Commander Barone had knowledge of and acquiesced in the way Officer Bowen and Sergeant Cortopassi went about intimidating and pressuring Officer Chatterji to terminate the audit.

69.     Officer Bowen and Sergeant Cortopassi both hold supervisory positions over Officer Chatterji and he is required to follow any orders given to him by either Officer Bowen or Sergeant Cortopassi within the PBP.

70.     On one occasion, Sergeant Cortopassi told Officer Chatterji that the "new administration" (i.e., Former Chief McLay's administration) was negatively affecting his "friends" at B-Three Solutions and that Officer Chatterji needed to stop the audit, or he would suffer.

71.     On another occasion, Officer Chatterji overheard Officer Bowen, Sergeant Cortopassi and Alexis Barone—Commander Barone's daughter, who was employed in Pittsburgh's Department of Innovation and Performance—stating that he was "disrupting things" with B-Three Solutions.

72.     Officer Chatterji, who is of Indian descent, also overheard Officer Bowen, Sergeant Cortopassi and Alexis Barone calling him a "sandn*****" and "Haji."

73.     Officer Bowen, Sergeant Cortopassi and Alexis Barone discussed together how no "brown person" like Officer Chatterji should be promoted within the PBP.

74.     The PBP—including Director Hissrich as the Director of the Department of Public Safety—was notified of the derogatory and racist remarks concerning Officer Chatterji but failed to take any substantive action to address or stop them from reoccurring.

75.     Commander Barone also learned of the derogatory and racist remarks made by those aligned with her and ratified such remarks.

76.     The PBP, Commander Barone and Director Hissrich are aware that Sergeant Cortopassi continues to make derogatory and racist remarks directed at Officer Chatterji because of his national origin through channels such as computer and internet chat rooms that are frequented by supervisors and decision-makers of the PBP.

77.     Such derogatory remarks in those chat rooms include calling Officer Chatterji "Muhammed" and "Chatter Teeth," and telling him that only "Americans" can wear their badge on their uniform if they have military service.

**Retaliation**

78.     Former Chief McLay officially announced his resignation on November 4, 2016; his last day with the PBP was November 8, 2016.

79.     In February 2017, Commander Barone was promoted to Assistant Chief of the PBP and Deputy Director of the Department of Public Safety by Director Hissrich.

80.     As the Assistant Chief and Deputy Director, Barone is employed in positions both subordinate and supervisory to the Chief of the PBP—making her one of, if not the most, influential decisionmakers in the PBP.

81.     Prior to her promotion, Commander Barone and Director Hissrich worked closely to monitor the B-Three Solutions' audit, and Director Hissrich was aware of and ratified Commander Barone's efforts to stop Officer Chatterji from auditing the PBP's information technology systems at the direction of Former Chief McClay and Chief of Staff Holmes.

82.     As the Deputy Director of the Department of Public Safety, Barone is the second highest ranking official in the PBP and works together with Director Hissrich in all personnel decisions for the PBP, and, often, Director Hissrich delegates final authority for personnel decisions for the PBP to Deputy Director Barone.

83.     As Deputy Director of the Department of Public Safety, Barone reports directly to Director Hissrich and Director Hissrich is aware of all actions taken by Deputy Director Barone.

84.     As the Assistant Chief and Deputy Director, Barone is a policymaker for the PBP.

85.     Director Hissrich has also delegated other specific policymaking functions for the PBP to Assistant Chief Barone by, among other things, promoting her to Assistant Chief of Administration for the PBP.

86.     As the Assistant Chief of Administration for the PBP, Barone is a policymaker for computer operations (i.e., information technology systems) and OMI.

87.     Director Hissrich gave Assistant Chief Barone all these promotions, and delegated policymaking functions to Assistant Chief Barone, because of the audit.

88.     Prior to Former Chief McClay's resignation, Officer Chatterji received the highest attainable levels in his performance reviews with the PBP.

89.     After Former Chief McClay resigned from the PBP, Officer Chatterji received lesser performance reviews than he received in the past because Assistant Chief Barone negatively influenced Officer Chatterji's career with the PBP by using her position as both Assistant Chief and Deputy Director.

90.     Deputy Director Barone also negatively influenced Officer Chatterji's career by leveraging her relationship with Director Hissrich against him.

91.     Assistant Chief Barone terminated Officer Chatterji's keycard access to the PBP's headquarters following Former Chief McLay's resignation and terminated Officer Chatterji's involvement in all PBP projects run out of headquarters.

92.     Officer Chatterji later met with Assistant Chief Barone about this demotion, who told him that he is "done with the police department," he has "no future with the police department," he "will never be promoted," and he "should find another job."

93.     Officer Chatterji returned to his regular shifts as a patrol officer in Zone 2.

94.     Upon returning to Zone 2, Officer Chatterji was advised by his lieutenant that he could never speak about anything related to Assistant Chief Barone or B-Three Solutions again, an order that the lieutenant stated was given by Assistant Chief Barone.

95.     Despite continued direct and indirect harassment from Assistant Chief Barone, Officer Chatterji attempted to move forward in his career with the PBP by preparing for and taking the sergeant's examination, where he scored number one in all categories, as well as number one overall for all qualified applicants within the PBP for the sergeant's promotion.

96.     Officer Chatterji's number one overall ranking entitled him to the sergeant's promotion over any other candidate in the PBP.

97.     On November 20, 2017, despite scoring number one overall, Officer Chatterji was told that Assistant Chief Barone ordered that he not be promoted to sergeant because of a baseless investigation that she had initiated with OMI into Officer Chatterji's audit under Former Chief McLay of B-Three Solutions and her role or relationship with B-Three Solutions.

98.     No patrol officer within the PBP has scored number one overall and not been promoted to sergeant.

99.     Previously, officers within the PBP who have been under investigation by OMI, even for meritorious claims, have been promoted if they otherwise qualified for that promotion.

100.    Officer Chatterji later learned that, because of Assistant Chief Barone's influence and intimidation tactics, he did not even receive a recommendation for sergeant.

101.    Officer Chatterji was never provided a hearing over his non-promotion.

102.    Director Hissrich was copied on emails from and involving Assistant Chief Barone regarding the decision not to promote Officer Chatterji.

103.    Through numerous communications, in person and otherwise, Assistant Chief Barone told Director Hissrich not to promote Officer Chatterji because of the audit, and Director Hissrich approved that recommendation by not promoting Officer Chatterji.

104.    Director Hissrich directed that Officer Chatterji not be promoted to sergeant despite being aware that Former Chief McClay and Chief of Staff Holmes had ordered Officer Chatterji to be part of the work group that was auditing the information technology systems of the PBP including those relating to B-Three Solutions.

105.    Director Hissrich also reviewed all the internal memorandums and reports that were prepared by Officer Chatterji and other members of the work group concerning the audit yet still chose not to promote him.

106.    In connection with Officer Chatterji not receiving the sergeant's promotion, Assistant Chief Barone stated to colleagues and other staff members of Pittsburgh, including Director Hissrich, that Officer Chatterji only scored number one overall because he was "Indian" and thus was given extra credit that "Americans" were not given.

107.    Assistant Chief Barone stated to colleagues and other staff members of Pittsburgh, including Director Hissrich, that Officer Chatterji was not promoted because of his incompetence because of his lack of understanding of "American ways."

108.    Director Hissrich adopted the racially discriminatory comments about Officer Chatterji that were made by Assistant Chief Barone, and intentionally chose not to promote Officer Chatterji because, in his view, he did not want an officer of Indian-descent questioning any decisions that had been or were being made by Pittsburgh and/or the PBP.

109.    There are over 850 officers in the PBP.

110.    Officer Chatterji is the only officer in the PBP of Indian-descent.

111.    Officer Chatterji is the first immigrant to serve in the PBP in over a decade.

112.    Officer Chatterji is the first ever immigrant officer of Indian-descent in the PBP to rank number one overall for promotion to the rank of sergeant.

113.    Assistant Chief Barone and Director Hissrich selected and/or reaffirmed a racially-charged position about Officer Chatterji because of his Indian-descent in deciding not to promote him.

114.    Director Hissrich did not and does not want Officer Chatterji, an immigrant of Indian-descent, to become a sergeant in the PBP after ranking number one overall for that promotion.

115.    On January 29, 2018, at the direction of Assistant Chief Barone, Public Information Officer Alicia George ("PIO George") confronted Officer Chatterji about auditing B-Three Solutions.

116.    During that confrontation, PIO George told Officer Chatterji that his career would be ruined unless he cooperated with Assistant Chief Barone, which included signing a non-disclosure agreement relating to any information he learned about her and B-Three Solutions during the audit.

117.    As of May 2018, Director Hissrich promoted at least eight patrol officers to the rank of sergeant that scored below Officer Chatterji, none of whom are of Indian descent.

118.    Officer Chatterji is currently supervised by a sergeant that was promoted over him despite scoring less on the sergeant's examination, which is humiliating and embarrassing for any reasonable police officer.

119.    Director Hissrich was copied on Assistant Chief Barone's OMI referral against Officer Chatterji and acknowledged and approved receipt of that referral.

120.    Director Hissrich also authorized Assistant Chief Barone to initiate her baseless OMI complaint against Officer Chatterji as a reason not to promote him.

121.    Assistant Chief Barone continues to take overt steps to ruin Officer Chatterji's career with the PBP because of an audit that he was ordered to conduct, including publicizing false and defamatory statements about him, directly and indirectly threatening him, and attempting to discredit him within not only the PBP but Pittsburgh.

122.    After the above-captioned action was filed, Assistant Chief Barone amended her OMI complaint against Officer Chatterji to include additional allegations against him for untruthfulness, which permitted her to investigate Officer Chatterji without limitations.

123.    With Director Hissrich's approval, Assistant Chief Barone—as the decisionmaker for OMI—has since used the OMI process to question Officer Chatterji about the specific allegations in this action to obstruct and interfere with this lawsuit and further discredit him.

### COUNT I – EQUAL PROTECTION VIOLATION UNDER THE FOURTEENTH AMENDMENT PURSUANT TO 42 U.S.C. § 1983

#### (Plaintiffs vs. All Defendants)

124.    All paragraphs herein are incorporated by reference.

125.    Officer Chatterji is the only patrol officer in the PBP that is of Indian descent.

126.    Officer Chatterji was the most qualified candidate for promotion to the rank of sergeant.

127.    Pittsburgh and Assistant Chief Barone, together and/or individually, intentionally discriminated against Officer Chatterji by not promoting him to sergeant because of his national origin, in violation of the Equal Protection Clause of the United States Constitution.

128.    Officer Chatterji has suffered actual damages in lost wages and loss of future earnings, as well emotional distress, humiliation, embarrassment and damage to his reputation, because of Pittsburgh and Assistant Chief Barone's conduct.

WHEREFORE, Officer Chatterji respectfully requests that this Court enter a judgment against Pittsburgh and Assistant Chief Barone and grant the following relief: (i) compensatory damages, including lost wages, lost future earnings, humiliation, embarrassment, damage to reputation and emotional pain and suffering; (ii) punitive damages; (iii) attorney's fees and costs; and (iv) all other relief as this Court deems just and proper.

## COUNT II – VIOLATION OF THE WHISTLEBLOWER LAW

### (Plaintiff vs. All Defendants)

129.     All paragraphs herein are incorporated by reference.

130.     Pittsburgh is an employer as defined by the Whistleblower Law because it is a public body, and Assistant Chief Barone is an employer under the Whistleblower Law because she receives money from Pittsburgh to perform work or provide services for Pittsburgh.

131.     Officer Chatterji was authorized to audit B-Three Solutions by Former Chief McLay and Chief of Staff Holmes as part of his employment.

132.     Pursuant to the audit, Officer Chatterji reported evidence of substantial abuse, misuse, destruction and/or loss of funds or resources belonging to Pittsburgh, verbally and in writing, relating to Assistant Chief Barone, the PBP and B-Three Solutions to Former Chief McLay and Chief of Staff Holmes.

133.     Also pursuant to the audit, Officer Chatterji reported evidence of potential federal grant fraud, verbally and in writing, relating to Assistant Chief Barone, the PBP and B-Three Solutions to Former Chief McLay and Chief of Staff Holmes.

134.     Because Officer Chatterji reported evidence of waste and wrongdoing to Former Chief McLay and Chief of Staff Holmes relating to Assistant Chief Barone, the PBP and B-Three Solutions, Pittsburgh and Assistant Chief Barone retaliated against him by not promoting him to sergeant.

135.     Officer Chatterji has suffered actual damages in lost wages and loss of future earnings, as well emotional distress, humiliation, embarrassment and damage to his reputation, because of Pittsburgh and Assistant Chief Barone's conduct.

WHEREFORE, Officer Chatterji respectfully requests that this Court enter a judgment against Pittsburgh and Assistant Chief Barone and grant the following relief: (i) compensation for the full value of wages and benefits that Officer Chatterji would have received had it not been for Defendants' retaliatory conduct, with interest until the date of any verdict as to be determined at trial; (ii) actual and compensatory damages, including lost wages, lost future earnings, humiliation, embarrassment, damage to reputation and emotional pain and suffering in an amount to be determined at trial; (iii) attorney's fees, witness fees and costs of litigation; and (iv) all other relief this Court deems just and proper.

Respectfully submitted,

THE LAW OFFICES OF TIMOTHY P. O'BRIEN

/s/ Alec B. Wright
Timothy P. O'Brien
Pa. ID No. 22104
Alec B. Wright
Pa. ID No. 316657
239 Fourth Avenue
Investment Building, Suite 2103
Pittsburgh, Pennsylvania 15222
(412) 260-1662

*Counsel for Plaintiff,*
*Souroth Chatterji*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served this 14th of May

2018 via this Court's CM/ECF electronic filing system upon all counsel of record:


/s/ Alec B. Wright
*Counsel for Plaintiff*