**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SOUROTH CHATTERJI, | : | No. 2:18-cv-00199-CB |
| | : | |
| Plaintiff, | : | *Electronically filed* |
| | : | |
| v. | : | |
| | : | |
| CITY OF PITTSBURGH and ASSISTANT | : | **JURY TRIAL DEMANDED** |
| CHIEF OF THE PITTSBURGH BUREAU | : | |
| OF POLICE LINDA BARONE, | : | |
| individually, | : | |
| | : | |
| Defendants. | : | |

**BRIEF IN OPPOSITION TO DEFENDANT
CITY OF PITTSBURGH'S MOTION TO DISMISS**

Plaintiff Souroth Chatterji ("Officer Chatterji"), by his counsel, hereby files this Brief in Opposition to Defendant City of Pittsburgh's (the "City") Motion to Dismiss the Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6) ("Motion to Dismiss") (Doc. 27) as follows:

**I.     Introduction**

In 2015, Officer Chatterji—who is of Indian-descent—was ordered by former Chief of the Pittsburgh Bureau of Police (the "PBP") Cameron McClay ("Former Chief McLay") and Chief of Staff Commander Eric Holmes ("Chief of Staff Holmes") to become part of a work group within the PBP to audit the information technology systems it was utilizing.  Pursuant to that audit, Officer Chatterji reported to Former Chief McLay and Chief of Staff Holmes his good faith understanding that the PBP had paid millions of dollars to B-Three Solutions, Inc. ("B-Three Solutions") for updates and upgrades to its information technology systems that the audit revealed were neither completed nor implemented.  As discussed in detail below, after the audit, despite scoring and qualifying number one overall for a promotion to the rank of sergeant in the PBP, the City intentionally chose not to promote Officer Chatterji to sergeant.

Liability in this case centers on whether the City chose not to promote Officer Chatterji to sergeant because it was motivated by intentional discriminatory animus toward him, in retaliation for his good faith report of waste, or both.  At this early stage, it may reasonably be inferred from the facts alleged in the Amended Complaint that either of those two reasons, or a combination of them, caused the City not to promote Officer Chatterji.  Indeed, it is well-established that Officer Chatterji may plead alternative or even inconsistent claims in the Amended Complaint when—like in this case—they are supported by reasonable factual inferences.  *See* F.R.C.P. 8(d)(2)-(3).

Only two individuals within the City could have directed that Officer Chatterji not be promoted to sergeant.  Those individuals are (i) Wendell Hissrich, as the Director of the Department of Public Safety and the Chief of the Administration Bureau ("Hissrich"), and (ii) Defendant Linda Barone, as the Deputy Director of the Department of Public Safety, the Assistant Chief of the Administration Bureau and the Assistant Chief of the PBP ("Barone").  As of May 2018, Barone and/or Hissrich promoted at least eight patrol officers—none of whom are of Indian-descent—to the rank of sergeant that scored below Officer Chatterji.

Officer Chatterji is the only officer of Indian-descent in the PBP out of nearly 850 officers.  He is the first immigrant to serve in the PBP in over a decade and the first ever immigrant officer of Indian-descent to rank number one overall for promotion to the rank of sergeant.  He is also the first patrol officer in the PBP not to be promoted to sergeant after ranking number one overall for that promotion.

Prior to scoring number one overall, Barone and Hissrich were made aware that officers under Barone's direct control and supervision called Officer Chatterji a "sandn*****" and "Haji" and discussed how no "brown person" like Officer Chatterji should be promoted within the PBP.  Barone and Hissrich both acquiesced in that racially-targeted conduct by failing to take any

substantive action to address or stop those types of racist remarks toward Officer Chatterji from reoccurring even though they had the authority to discipline the conduct of their subordinates. Indeed, Barone and Hissrich continue to permit officers who are aligned with Barone to make racist remarks about Officer Chatterji through computer and internet chat rooms that are frequented by members of the PBP, where he is called things like "Muhammed" and "Chatter Teeth" and told that he—a two-tour Iraq War veteran—does not deserve to display his "American" military status because he is "Indian."

Furthermore, Barone stated to Hissrich that Officer Chatterji only scored number one because he was "Indian" and thus was given extra credit that "Americans" were not given. Barone also *admitted* to Hissrich that Officer Chatterji was not promoted because of his incompetence due to his lack of understanding of "American ways." At this early stage, all these facts reasonably demonstrate—or raise a reasonable inference—that Barone and/or Hissrich chose not to promote Officer Chatterji because he is of Indian-descent, in violation of the Equal Protection Clause.

The City' Motion to Dismiss does not address the factual basis for Officer Chatterji's claim under Pennsylvania's Whistleblower Law, 43 Pa.C.S.A. § 1421, *et seq.* (the "Whistleblower Law"), that he reported in good faith his belief that the PBP was wasting substantial funds on information technologies and that he was retaliated against for doing so. The City thus concedes the sufficiency of that claim at this early stage and this Court should deny its Motion on that basis alone. If this Court deems the City to have not waived that challenge, the Amended Complaint's factual allegations clearly demonstrate that Officer Chatterji was threatened, retaliated and discriminated against for making a good faith report of waste to his superiors in the PBP:

- in 2015, Officer Chatterji was ordered by Former Chief McLay and Chief of Staff Holmes to become part of a work group within the PBP to audit the information technology systems it was utilizing;

- pursuant to that audit, Officer Chatterji reported to Former Chief McLay and Chief of Staff Holmes his good faith understanding that the PBP had paid millions of dollars to B-Three Solutions for updates and upgrades to its information technology systems that the audit revealed were neither completed nor implemented;

- during and after the audit, Barone told Officer Chatterji, among other things, that:

  o "if he kept digging into B-Three Solutions, it would lead to his ruin;"

  o "chiefs come and go," referring to Former Chief McLay, and that he would ultimately be the one that suffered for auditing B-Three Solutions;

  o he is "done with the police department;"

  o he has "no future with the police department;"

  o he "will never be promoted;"

  o he "should find another job;"

- on numerous occasions during the audit, officers under Barone's direct control and supervision and who were aligned with Barone, including Officer Dawn Bowen ("Officer Bowen") and Sergeant Anthony Cortopassi ("Sergeant Cortopassi"), intimidated and pressured Officer Chatterji to terminate the audit on her behalf, stating to Officer Chatterji, among other things, that Former Chief McLay's administration was negatively affecting his "friends" at B-Three Solutions and that Officer Chatterji needed to stop the audit, or he would suffer;[1] and

- despite scoring number one overall in the PBP for promotion to the rank of sergeant, Officer Chatterji was denied that promotion because of a baseless investigation with the City's Office of Municipal Investigations ("OMI") that Barone initiated against him and that Hissrich had authorized Barone to initiate.[2]

---

[1] It was during these occasions that Officer Chatterji was also called "sandn*****" and "Haji" and told that no "brown person" like him should be promoted within the PBP.

[2] As indicated above, Officer Chatterji also learned that Barone told Hissrich that he was not promoted because of his incompetence due to his lack of understanding of "American ways."

Simply put, it may reasonably be inferred from the Amended Complaint that the City's decision not to promote Officer Chatterji was either motivated by intentional racial animus and/or in retaliation for his good faith report of waste to his superiors in the PBP.  The City's deceitful assertions of unsubstantiated matters outside the four corners of the Amended Complaint—which are used in an obviously improper attempt to discredit Officer Chatterji to this Court—can only be said to operate as concessions to the sufficiency of those claims at this early stage.[3]  The City's personal attacks against Officer Chatterji are shameful distractions from a panoply of facts reasonably demonstrating plausible claims for relief against the City for violating the Equal Protection Clause and the Whistleblower Law.  For all these reasons, and for all those reasons stated below, this Court should deny the City's Motion to Dismiss.

## II.     Standard of Review

A complaint does not require "detailed factual allegations."  *See Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also* F.R.C.P. 8(a)(2).  "The touchstone of the pleading standard is plausibility."  *Bristrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Bristrian*, 696 F.3d at 365 (citation

---

[3] The City cites a news article dated March 2018 about Officer Chatterji to cast him in a false light to this Court.  The City should be admonished for such unprofessional conduct.  At a minimum, this Court should strike those statements from its Motion to Dismiss because they are obviously immaterial, impertinent and scandalous.  *See* F.R.C.P. 12(f).

Moreover, the City improperly references Officer Chatterji's prior Motion for Protective Order that was filed against it after the City interviewed Officer Chatterji at the Office of Municipal Investigations about the specific allegations in the Amended Complaint.  *See* Doc. 12.  Nothing in that Motion or the City's Response in Opposition to it is in any way germane to the instant Motion to Dismiss.  Therefore, obviously those filings and the City's references to them should be considered by this Court.

omitted); *see also Thompson v. Real Estate Mort. Network*, 748 F.3d 142, 147 (3d Cir. 2014) (stating that a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element") (citations omitted).  "[T]he facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits." *Phillips*, 515 F.3d at 231 (citation omitted).

## III.    Argument

### A.    The Amended Complaint states a plausible claim for relief against the City for depriving Officer Chatterji of his rights under the Equal Protection Clause

The City primarily contends that Officer Chatterji's claim under the Equal Protection Clause should be dismissed because—as the City asserts—that claim is apparently better-suited under Title VII, 42 U.S.C. § 2000e, *et seq.*,[4] and because it is not actionable as a class of one. These contentions confuse the issue because the Equal Protection claim asserted against the City is based on the decision of its duly-recognized policymakers (i.e., Hissrich and/or Barone) not to promote Officer Chatterji because of his race or national origin.  As it must, the City only briefly addresses whether it may be held liable for violating the Equal Protection Clause for a single decision by one of its policymakers.  To the extent the City does address this legal question, it seeks to trivialize it in a manner that is entirely inconsistent with the law.

---

[4] Any suggestion that Officer Chatterji cannot pursue his § 1983 claim independent of a Title VII claim is obviously without merit.  *See e.g.*, *Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1079 (3d Cir. 1990) (collecting cases) (explaining that "[w]e have previously held that the comprehensive scheme provided in Title VII does not preempt section 1983, and that discrimination claims may be brought under either statute, or both[,]" which "is consistent with the conclusion of every other court of appeals that has decided the question").

It is well-settled through a trio of Supreme Court cases that municipal liability may be imposed upon single decisions or on single occasions by municipal policymakers.  *See e.g.*, *Pembaur v. City of Cincinatti*, 475 U.S. 469 (1986) (plurality); *City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988) (plurality); and *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701 (1989).  In *Pembaur*, the Supreme Court held that municipal liability may be imposed for a single decision by policymakers because their acts are those which the municipality has officially sanctioned or ordered.  475 U.S. at 478-80 (stating that "[n]o one has ever doubted … that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body – whether or not that body had taken similar action in the past or intended to do so in the future – because even a single decision by such a body unquestionably constitutes an act of official government policy") (citation omitted).  The Supreme Court in *Pembaur* made clear that *Monell* "expressly envisioned other officials whose acts or edicts may fairly be said to represent official policy, … and whose decisions therefore may give rise to municipal liability under § 1983."  *Id.* (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978) (internal quotations omitted)).

Moreover, *Pembaur* recognized that "a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations."  *Id.* at 481.  The Supreme Court thus reasoned that, "[i]f the decision to adopt a particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood."  *Id.*; *see also Andrews v. Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur*, 475 U.S. at 481) (holding that policy is made when a decisionmaker possessing final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict").  "More importantly,

where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly[,]" and "denying compensation to a victim based on the single act or decision of a final policymaker is contrary to the fundamental purpose of 42 U.S.C. § 1983." *Id.*

In *Praprotnik*, the Supreme Court further analyzed when isolated decisions by municipal officials may expose the municipality itself to liability under 42 U.S.C. § 1983.  485 U.S. at 114. There, the Supreme Court stated that "States have extremely wide latitude in determining the form that local government takes, and local preferences have led to a profusion of distinct forms" such that "one may expect to find a rich variety of ways in which the power of government is distributed among a host of different officials and official bodies." *Id.* at 124-25 (citation omitted).  The Supreme Court determined that "state law (which may include valid local ordinances and regulations) will always direct a court to some official or body that has the responsibility for making law or setting policy in any given area of local government's business." *Id.* at 125.

The Supreme Court also recognized that municipal policymakers may delegate their policymaking authority to another official. *Id.* at 127 (citing *Pembaur*, 475 U.S. at 482-82). Therefore, "when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with their policies." *Id.*  The Supreme Court held that "[i]f the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.*; *see also Andrews*, 895 F.2d at 1481 (quoting *Praprotnik*, 485 U.S. at 127).

In *Jett*, the Supreme Court affirmed in a majority decision the positions set forth in *Pembaur* and *Praprotnik*. The Supreme Court ultimately determined that trial judges must "identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue." 491 U.S. at 737. The Supreme Court held that "[o]nce those officials who have the power to make official policy on a particular issue have been identified, **it is for the jury to determine whether their decisions have caused the deprivation of rights at issue**[.]" *Id.* (emphasis added) (citation omitted).

Turning to the instant matter, the City concedes that the Director of the Department of Public Safety (i.e., Hissrich) is a policymaker with respect to promotions in the PBP. *See* Motion to Dismiss, p. 3 and 9. That concession—or admission—is rooted in the City's Ordinances and Home Rule Charter.[5] Under the City's Ordinances, the Department of Public Safety and the PBP

---

[5] The Second Class City Code, 53 Pa.C.S.A. § 22101, *et seq.* is also applicable. It states, in relevant part:

> **The department of public safety shall be under the charge of one director, who shall be the head thereof. The care, management, administration and supervision of the police affairs,** and all matters relating to the public health, to the fire and police force, fire alarm telegraph, erection of fire-escapes, and the inspection of buildings and boilers, markets and food sold therein, and the construction, protection and repair of buildings erected for police and fire purposes, **shall be in charge of this department**.

> \*\*\*

> Vacancies in positions in the competitive class shall be filled by promotions from among persons holding positions in a lower grade in the bureau of police. Promotions shall be based upon merit to be ascertained by tests to be provided by the civil service commission and upon the superior qualifications of the person to be promoted as shown by his previous service and experience. **The civil service commission shall maintain a list of those persons qualified for promotion to the next superior position, from which list the director of the department of public safety shall make all promotions from among the first four names**

are executive departments that "shall have power to prescribe policies, rules and regulations, not inconsistent with any law or ordinance" including, among other things, "for its own government … regulating the conduct of its officers, clerks and employees,… [and] concerning the distribution and performance of its business." *See* City Ordinance, Title One, Art. III, § 110.01(a)-(b).[6] The Department of Public Safety and the PBP are also considered major administrative units that "shall have charge of the supervision of all subordinate officers and employees deemed proper for the carrying out of the duties and powers of each department," *id.* at §110.01(d)-(e).

Moreover, "[t]he Department of Public Safety consists of the Police Bureau … and the Administration Bureau." *Id.* at § 116.01(I)(a). "Each of the bureaus which make up the Department of Public Safety shall be under the charge of a Chief who shall be the head thereof and shall have the same powers as a department director[.]" *Id.* "[T]he terms 'Superintendent or Chief of Police' …, or 'Chief, Administration Bureau' … shall be deemed to be equivalent to the heads of major administrative units[.]" *Id.* at § 116.01(I)(b).

"In addition to the bureau chiefs …, there shall be one … Director of Public Safety for the Department who shall be generally in charge of coordinating the various bureaus in addition to the specific duties and powers set forth [in § 116.02] and who shall also serve as the Chief of the Administration Bureau." *Id.* at § 116.01(II)(a). The bureau chiefs are responsible for the care, management, administration and supervision of police. *See id.* at § 116.02(I)(a). Finally,

---

**appearing on the list at the time the promotion is to be made**. The civil service commission shall have the power to determine in each instance whether an increase in salary constitutes a promotion.

53 Pa.C.S.A. §§ 22531 and 23535 (emphasis added).

[6] The City's Ordinances and Home Rule Charter are at:
https://library.municode.com/pa/pittsburgh/codes/code_of_ordinances?nodeId=COOR_TITONE
AD_ARTIIIOR_CH116DEPUSA.

"[a]ppointments, promotions and removals of subordinate officers and employees within major administrative units shall be made by the major administrative unit head on the basis of the system adopted."  Home Rule Charter, Art., § 701.

Considering this distribution of power within the City, it is clear that—at a minimum—the Director of the Department of Public Safety, the Chief of the PBP and the Chief of the Administration Bureau are all policymakers.  It is also clear that those policymakers are responsible for the management and administration of the PBP, including employment decisions and those relating to promotions.  As stated above, the City readily admits that at least the Director of the Department of Public Safety—i.e., Hissrich—is responsible for promotions within the PBP.[7]

Based on the distribution of power adopted by the City, Hissrich clearly could have delegated any of his responsibilities among the various bureaus.  The facts alleged in the Amended Complaint thus raise three critical inferences at this early stage with respect to policymakers for the City and the PBP:  First, Hissrich is a policymaker.  Second, Barone—as Assistant Chief of the PBP, Deputy Director of the Department of Public Safety and Assistant Chief of the Administration Bureau—is a policymaker.  And third, Hissrich delegated decision-making authority to Barone for promotions within the PBP, which would have included the decision not to promote Officer Chatterji and she would have thus either been the final policymaker with respect to that decision or her decision would have been ratified by Hissrich as the final policymaker.[8]

As stated above, the City concedes that Hissrich is a policymaker because of his positions as Director of the Department of Public Safety and Chief of the Administration Bureau.  In those

_____

[7] Hissrich, as Director of the Department of Public Safety, is also the Chief of the Administration Bureau.  *See* City Ordinance, Title One, Art. III, § 116.01(II)(a).

[8] Barone admitted to Hissrich that Officer Chatterji was not promoted to sergeant because of his incompetence due to his lack of understanding of "American ways," Doc. 15, Amended Complaint, ¶ 107.

positions, Hissrich himself could only have either retained responsibility for promotions within the PBP or delegated it. There are no other options available to Hissrich from which he could choose that promotions be made in the PBP. If he retained responsibility for promotions, then his choice not to promote Officer Chatterji represents official policy for the City. If Hissrich delegated that responsibility, then it may reasonably be inferred from the facts alleged in the Amended Complaint that it would have been delegated to Barone (or, at least, a fact question exists as to whether that responsibility was delegated to Barone) whose choice not to promote Officer Chatterji represents official policy for the City.

The Amended Complaint alleges facts that Hissrich was responsible for promoting Barone to Assistant Chief of the PBP, Assistant Chief of the Administration Bureau and Deputy Director of the Department of Public Safety, Doc. 15 at ¶¶ 9 and 79. The Amended Complaint also alleges that Barone reports directly to Hissrich in each of those positions, *id.* at ¶¶ 80-87, and that Barone is employed as both a subordinate and a supervisor to the Chief of the PBP (i.e., making her more powerful and influential than the Chief of the PBP), *id.* at ¶ 80. Those facts cannot be overlooked at this stage, and they reasonably demonstrate that Hissrich and Barone worked closely together and were in constant communication with each other during the audit, in regard to racially-charged statements about Officer Chatterji, and with respect to the decision not to promote him, *id.* at ¶¶ 53-57, 66, 74-77, 79-87, 90, 102-108, 113-114, 117, 119-120 and 123.

Various race-based comments that are alleged in the Amended Complaint also cannot be overlooked. Barone stated to Hissrich (and others) that Officer Chatterji was not promoted to sergeant because of his incompetence due to his lack of understanding of "American ways," *id.* at ¶ 107. Barone also stated to Hissrich (and others) that Officer Chatterji only scored number one overall for the sergeant's promotion because he was "Indian" and thus was given extra credit that

"Americans" were not given, *id.* at ¶ 106.  Indeed, at least eight patrol officers that scored below

Officer Chatterji and who were not of Indian-descent were promoted to the rank of sergeant, *id.* at

¶ 117.  These critical facts demonstrate that whichever policymaker chose not to promote Officer

Chatterji—whether it was Hissrich or Barone—he or she did so at least in part because Officer

Chatterji is of Indian-descent.

In the end, there are only two officials who would have the authority to make official policy

for promotions in the PBP: Hissrich and/or Barone.  The City's Motion to Dismiss concedes that

Hissrich is a policymaker, which alone is sufficient for Officer Chatterji to survive its Motion to

Dismiss.   Hissrich, however, may have delegated that policymaking authority to Barone.

Regardless of whether Hissrich and/or Barone chose not to promote Officer Chatterji, because

either of them could have had the power to make official policy through that promotional decision

(or lack thereof)—and the policymaking officials having thus been identified—it is for the jury to

determine whether their decisions deprived Officer Chatterji of the rights guaranteed to him by the

Equal Protection Clause.  *See Jett*, 491 U.S. at 737.

A denial of equal protection under 42 U.S.C. § 1983 is established through the existence

of purposeful discrimination.  *See Keenan v. City of Phila.*, 983 F.2d 459, 465 (3d. Cir. 1992)

(citation omitted).  A plaintiff must demonstrate that he or she "received different treatment from

that received by other individuals similarly situated."  *Id.* (citation omitted).  Therefore, "[t]he

elements of a valid § 1983 claim for denial of Equal Protection based on intentional racial animus

are that: (1) the plaintiff belongs to a protected class; (2) the defendant acted under color of state

law; and (3) the defendant was treated plaintiff differently because of his race."  *Adams v. City of

Greensburg*, 2018 U.S. Dist. LEXIS 41688, *6-7 (W.D. Pa. March 14, 2018) (citation omitted).

"There are multiple ways for a plaintiff to prove such a claim, including through race-based

comments that reveal a discriminatory motive underlying an adverse employment action." *Id.* at *7 (citation omitted); *see also Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 368-69 (3d Cir. 2008) (holding that discriminatory remarks provide background evidence that may be critical to a jury's determination of whether the decision-maker was more likely than not acting out of a discriminatory motive).

Officer Chatterji is clearly a member of a protected class because he is of Indian-descent, Doc. 15 at ¶ 72. Officer Chatterji is also the only officer of Indian-descent in the PBP out of more than 850 officers that comprise the PBP, *id.* at ¶¶ 109-110. He is the first immigrant to serve in the PBP in over a decade, *id.* at ¶ 111, and he is the first ever immigrant officer of Indian-descent to rank number one overall for promotion to the rank of sergeant, *id.* at ¶ 112. Importantly, he is the first patrol officer in the PBP to have been ranked number one overall and not been promoted to sergeant, *id.* at ¶ 98. Indeed, as stated above, as of May 2018, at least eight patrol officers—none of whom are of Indian-descent—were promoted to the rank of sergeant that scored below Officer Chatterji, *id.* at ¶ 117. All these facts are more than sufficient to reasonably demonstrate the City's intentional discriminatory animus toward Officer Chatterji at this early stage.

The Amended Complaint alleges further, however, that prior to Officer Chatterji scoring number one overall for the sergeant's promotion, many racially derogatory things were said about him within the PBP because he is of Indian-descent and that the City was aware of those racist comments. For instance, Barone and Hissrich were made aware that officers under Barone's direct control and supervision—as well as Barone's daughter, Alexis Barone—called Officer Chatterji a "sandn*****" and "Haji" and discussed how no "brown person" like Officer Chatterji should be promoted within the PBP, *id.* at ¶¶ 72-73. Despite being made aware of these derogatory and racist remarks, neither Barone nor Hissrich took any substantive action to address or stop them from

14

reoccurring, *id.* at ¶ 74-75.  In fact, Barone and Hissrich were made aware that at least one of those police officers continues to make racist remarks about Officer Chatterji through computer and internet chat rooms that are frequented by members of the PBP where he has called Officer Chatterji "Muhammed" and "Chatter Teeth," yet they have done nothing to stop it, *id.* at ¶ 75-77. Barone and Hissrich were also made aware that those same officers, who are under Barone's direct control and supervision, continue to harass Officer Chatterji—who is a United States Army veteran having served two tours in Iraq—by stating that he does not get to display his "American" military service because is "Indian," *id.* at ¶ 77.

Furthermore, Officer Chatterji learned that Barone ordered that he not be promoted to sergeant, *id.* at ¶ 97, and that Hissrich was copied on emails from and involving her decision not to promote him, *id.* at ¶¶ 102-103.  In connection with Officer Chatterji not receiving the sergeant's promotion, Barone stated to Hissrich that he only scored number one overall because he was "Indian" and thus was given extra credit that "Americans" were not given, *id.* at ¶ 106.  Barone also admitted to Hissrich (and others) that Officer Chatterji was not promoted because of his incompetence due to his lack of understanding of "American ways," *id.* at ¶ 107.

At this early stage, all these facts reasonably demonstrate that Barone and/or Hissrich had an underlying discriminatory motive in deciding not to promote Officer Chatterji to sergeant. These facts clearly demonstrate that Officer Chatterji was treated differently because of his race from those similarly-situated to him, and numerous race-based comments by or involving policymakers for the City reasonably demonstrate the racial animus underlying the decision not to promote him.  Therefore, this Court should deny the City's Motion to Dismiss.

### B.     The Amended Complaint states a plausible claim for relief under the Whistleblower Law and the City fails to address the merits of that claim

The gravamen of Officer Chatterji's claim under the Whistleblower Law is that he was discriminated, threatened and/or or retaliated against by the City and Barone for making a good faith report of *waste of funds* to his superiors in the PBP.  The City does not contest that issue in its Motion to Dismiss and has thus waived its right (or conceded the issue) to challenge the sufficiency of that claim at this stage.  Instead, the City only contends that Officer Chatterji's claim fails because the Amended Complaint does not sufficiently allege *wrongdoing* under the Whistleblower Law.  The City also asserts an unsupported procedural defense based on the statute of limitations to defeat Officer Chatterji's otherwise plausible claim for relief.[9]  Because the City fails to address *waste* under the Whistleblower Law in its Motion to Dismiss, it should be denied outright.  However, even if this Court overlooks the City's waiver (or concession), the facts alleged in the Amended Complaint state a plausible claim for relief under the Whistleblower Law against the City.

Under the Whistleblower Law:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

*Id.* at § 1423.  "A person who alleges a violation of this act may bring a civil action in a court of competent jurisdiction for appropriate injunctive relief or damages, or both, within 180 days after the occurrence of the alleged violation."  *Id.* at § 1424(a).  "An employee alleging a violation of

---

[9] It is not clear why the City "notes" that Officer Chatterji lacks First Amendment protection in its Motion to Dismiss.  That claim is not asserted in the Amended Complaint nor an issue before this Court.  Therefore, although Officer Chatterji recognizes that the City has apparently raised this issue, it is not being addressed in this Brief in Opposition.

this act must show by a preponderance of the evidence that, prior to the alleged reprisal, the employee or a person acting on behalf of the employee had reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority." *Id.* at § 1424(b).

A "whistleblower" is defined as a "person who witnesses or has evidence of wrongdoing **or waste** while employed and who makes a good faith report of the wrongdoing **or waste**, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority." 43 Pa.C.S.A. § 1422 (emphasis added). "Employer" is defined in part as a "public body," and public bodies include cities, departments and "[a]ny other body which is created by … political subdivision authority or which is funded in any amount by … political subdivision authority[.]" *Id.* "Waste" is defined as an "employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources belonging to or derived from Commonwealth or political subdivision sources." *Id.* "Good faith report" is defined as a "report of conduct defined in this act as wrongdoing or waste which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true." *Id.*

As stated above, the City does not dispute that it is an employer for purposes of the Whistleblower Law. The City also does not dispute that Officer Chatterji made a good faith report of waste to one of his superiors in the PBP and that he was retaliated against for making that report. Nevertheless, even if this Court overlooks this fatal waiver, the facts alleged in the Amended Complaint state a plausible claim for relief against the City for violating the Whistleblower Law.

The Amended Complaint alleges that, in early 2015, Officer Chatterji was transferred to the PBP's headquarters to work with Former Chief McLay and Chief of Staff Holmes as part of a

work group to explore how the PBP could upgrade its information technology systems, Doc. 15 at ¶ 14.  As part of this work group, Officer Chatterji was ordered by Former Chief McLay to audit the information technology systems being utilized by the PBP and to report all results of the audit to him and Chief of Staff Holmes, *id.* at ¶ 15.  As the audit progressed, around October 2015, Former Chief McLay and Chief of Staff Holmes tasked Officer Chatterji with gathering information on a new "Report Management System" (known as an "RMS System") and an update to the PBP's computer-aided dispatch system (known as a "CAD System"), *id.* at ¶ 16.

Specifically, Former Chief McLay and Chief of Staff Holmes tasked Officer Chatterji with gathering information on RMS and CAD Systems that had been created by TriTech Software Systems, formerly known as Tiburon ("Tiburon"), *id.* at ¶ 17.  Former Chief McLay and Chief of Staff Holmes also tasked Officer Chatterji with gathering information on the National Crime Information Center terminal (known as "NCIC") and the RMS System that was already being used by the PBP, which included an NCIC terminal that had been created by Motorola Premier and an RMS System called the Automated Police Reports System (known as "APRS") that had been created by B-Three Solutions, *id.* at ¶ 18.  The purpose of the audit was two-fold: (i) compare the PBP's current RMS System, APRS by B-Three Solutions, with the Tiburon RMS System, and (ii) compare the PBP's current NCIC terminal, created by Motorola Premier, which worked in conjunction with the APRS, with the upgraded Tiburon CAD System, *id.* at 19.  The goal was to audit the PBP's information technology systems for areas of improvement in data collection and automation, *id.* at ¶ 20.

Through the audit, Officer Chatterji learned and reported information to Former Chief McLay and Chief of Staff Holmes that, among other things:

- the updated CAD system could be updated for free and had a significantly higher level of functionality than the version that was being used by the PBP, and was compatible with Tiburon's RMS System, which had a significantly higher level of functionality than the RMS System by B-Three Solutions, *id.* at ¶ 21;

- the Tiburon RMS System was compliant with the National Incident-Based System ("NIBRS"), which is an incident-based reporting system used by law enforcement agencies in the United States for collecting and reporting crime data, *id.* at ¶ 22, while the APRS by B-Three Solutions was neither NIBRS compliant nor usable for accurate crime data reporting, *id.* at ¶ 23;[10]

- the system that B-Three Solutions had implemented for producing documentation for an officer's daily activities (known as "daily activity sheets") was comprised of multiple screen shots only and no source code, *id.* at ¶ 29, meaning that officer's daily activities could not be automated into daily activity sheets, *id.* at ¶¶ 30-31;

- the PBP paid $110,000 to B-Three Solutions to automate the daily activity sheets in 2014, which was still not functional as of the date of the audit, *id.* at ¶ 32;

- in 2012, the PBP paid B-Three Solutions $150,000 to automate and standardize the chain of custody process for property and evidence seized by the PBP through a system known as "Evidence Barcoding," but that system was never implemented, *id.* at ¶¶ 35-36;

- in 2011, the PBP paid B-three Solutions $75,000 to automate and streamline the "Confidential Report Systems," but it was never automated, *id.* at ¶¶ 37-39;

- the PBP was paying B-Three Solutions $300,000 per year for annual software maintenance which would have been free from a different RMS provider, *id.* at ¶ 40;

- B-Three Solutions was charging the PBP separately for matters that ordinarily would have been included in a subscription for annual software maintenance, *id.* at ¶ 41; and

- in total, the PBP had paid B-Three Solutions over $1,000,000 for technology upgrades and updates that were either not completed, could have

---

[10] Officer Chatterji learned and reported that the Tiburon RMS System not only provided an obviously better cost-point for the PBP, but that it also significantly increased officer safety through automation and interfaced with law enforcement on a national basis. *Id.* at ¶ 24.

been performed by other companies at much lower cost (if not for free), or were inferior in comparison to industry standards, *id.* at ¶ 42.

Because of the information revealed through the audit, suspicions arose around Barone and her relationship with B-Three Solutions because of her role in providing B-Three Solutions with a sole source contract in 2006 that allowed it to monopolize the PBP's information technology systems, *id.* at ¶ 51-52.  At all relevant times, Barone was aware that she and B-Three Solutions were being audited/investigated, *id.* at ¶ 53, and so was Hissrich, who kept Barone apprised on all progressions and findings of the audit, *id.* at ¶ 54-55.  At all relevant times, Hissrich and Barone were aware that technology upgrades and updates by B-Three Solutions were either not completed, could have been performed by other companies at much lower cost (if not for free), or were inferior in comparison to industry standards, *id.* at ¶ 56.

Following the audit of B-Three Solutions, numerous decisionmakers for the City admitted the accuracy of Officer Chatterji's findings involving the substantial waste of funds on the PBP's information technology systems, including Hissrich, *id.* at ¶ 60.  Indeed, following the audit, the City's Council passed a resolution changing the way requests for proposals are received and analyzed by the City, intending not to allow companies like B-Three Solutions to obtain monopolies over the City's contracts and services, such as the one that Barone provided to B-Three Solutions, *id.* at ¶ 61.  This change was a direct result of the findings from the audit, *id.* at ¶ 62.

Throughout the time that Officer Chatterji was auditing B-Three Solutions and after the audit was stopped, he was subjected to various direct and indirect threats by Barone, including:

- During one meeting, Barone told Officer Chatterji that "if he kept digging into B-Three Solutions, it would lead to his ruin," *id.* at ¶ 64;

- Barone told Officer Chatterji that "chiefs come and go," referring to Former Chief McLay, and that he would ultimately be the one that suffered for auditing B-Three Solutions, *id.* at ¶ 65;

- On numerous occasions, officers under Barone's direct control and supervision and who were aligned with Barone intimidated and pressured Officer Chatterji to terminate the audit on her behalf, stating to Officer Chatterji, among other things, that Former Chief McLay's administration was negatively affecting their "friends" at B-Three Solutions and that Officer Chatterji needed to stop the audit, or he would suffer, *id.* at ¶¶ 67-71; and

- After the audit, Barone told Officer Chatterji that:

  o he is "done with the police department,"

  o he has "no future with the police department,"

  o he "'will never be promoted," and

  o he "'should find another job," *id.* at ¶ 92.

In 2017, Officer Chatterji became the number one overall qualified candidate for promotion to sergeant in the PBP, *id.* at ¶ 95-96. On November 20, 2017, despite scoring number one overall, Barone ordered that Officer Chatterji not be promoted to sergeant because of a baseless investigation that she had initiated with OMI against Officer Chatterji *with respect to the audit*, *id.* at ¶ 97 (emphasis added). No patrol officer within the PBP has scored number one overall and not been promoted to sergeant, *id.* at ¶ 98, and officers within the PBP who have been under investigation by OMI, even for meritorious claims, have been promoted if they otherwise qualified for that promotion, *id.* at ¶ 99. Hissrich was copied on emails from and involving Barone regarding the decision not to promote Officer Chatterji, *id.* at ¶ 102. As of May 2018, Hissrich promoted at least eight patrol officers to the rank of sergeant that scored below Officer Chatterji, *id.* at ¶ 117.[11]

---

[11] The Amended Complaint raises an alternative factual inference that Officer Chatterji was not promoted to sergeant because Hissrich did not want an officer of Indian-descent like Officer Chatterji questioning any decisions that had been or were being made by the City and/or the PBP, which Hissrich oversees, such as those decisions relating to the information technology systems in the PBP, *see id.* at ¶¶ 108-114.

All these facts—which this Court must accept as true at this early stage—reasonably demonstrate that the City discriminated, threatened and/or retaliated against Officer Chatterji for his good faith reporting of waste to his superiors in the PBP for an audit that he was ordered to conduct.  Even without the benefit of discovery at this early stage, it may reasonably be inferred from these facts that the City violated Officer Chatterji's rights under the Whistleblower Law. Nevertheless, the City cites to this Court's opinion in *Horvath v. Urban Redevelopment Auth. Of Pittsburgh*, 2017 U.S. Dist. LEXIS 46918 (W.D. Pa. March 29, 2017) to apparently draw some connection between this case and that one, but none can be drawn.

First, *Horvath* was decided at summary judgment with the benefit of a complete evidentiary record.  *See id.*[12]  That is not the case here where no discovery has been—or could be—conducted. And second, this Court in *Horvath* analyzed a three-year temporal gap in a Title VII retaliation case where the argument was premised on retaliation resulting from an equal pay complaint that had been filed three years prior to the plaintiff's termination.  *See id.* at *6.  There, because the temporal proximity described above was not unusually suggestive, this Court considered the entire summary judgment record to determine whether there was sufficient evidence to infer causation,

---

[12] The City cites numerous other summary judgment cases that are factually and procedurally distinguishable from the instant case to support its position.  Those cases are similarly analyzed under a complete evidentiary record and the respective courts merely found no inference of causation, whether because of "obvious and unimpeached non-retaliatory motives," *see C.M. v. Bd. of Educ.*, 128 Fed. Appx. 876, 883 (3d Cir. 2005), because there was no other evidence that the plaintiff's termination was because he requested a reasonable accommodation, *see Williams v. Phila Hous. Auth. Police Dep't*, 380 F.3d 751, 760 (3d Cir. 2004), or because the plaintiff failed to proffer any evidence to suggest that his termination was related to a report of wrongdoing, *see Mosley v. City of Pittsburgh Pub. Sch. Dist.*, 702 F. Supp. 2d 561, 586-88 (W.D. Pa. 2010).  In one of the cases cited by the City, the court did find there to be a causal link between the plaintiff's protected activity and an adverse workplace restriction.  *See Yeager v. UPMC Horizon*, 698 F. Supp. 2d 523, 547-549 (W.D. Pa. 2010).

ultimately concluding there was not. *Id.* That analysis is just factually and procedurally different from the case at bar.

Unlike *Horvath*, and although not cited by the City, *Bailets v. Pa. Tpk. Comm'n*, 123 A.3d 300 (Pa. 2015) is a summary judgment case that is analogous and instructive. In *Bailets*, the plaintiff was employed by the Pennsylvania Turnpike Commission from 1998 to 2008 and, during that time, complained frequently about improprieties and wasteful practices that he observed including—among other things—those relating to the Commission's computer systems contract with a third-party vendor. 123 A.3d at 301. There, the plaintiff complained to a supervisor and a co-worker (who later became his superior) about these wasteful practices and that there were deficiencies in the performance of the computer system and that a contracted-for knowledge transfer of the computer systems never occurred. *Id.* at 301-02. During that time, the supervisor and co-worker told the plaintiff that "[he] should not say anything about it," warned him not to "make waves or [his] job will be in jeopardy," and told him to "tread lightly." *Id.* In June 2008, the plaintiff's job title and responsibilities were changed, and he was removed from an additional position he had held. *Id.* He was terminated in November 2008 and thereafter filed suit.

Ultimately, the Pennsylvania Supreme Court in *Bailets* rejected the defendants' argument that there was no causal connection between the plaintiff's initial report in March 2007 and his termination in November 2008. *Id.* at 306. The Court thus denied summary judgment to the defendants. *Id.* at 310. The Court subsequently upheld the Commonwealth Court's order entering judgment on a $3.2 million verdict in favor of the plaintiff. *See Bailets v. Pa. Tpk. Comm'n*, 2018 Pa. LEXIS 1498 (Pa. March 27, 2018).

Here, like in *Bailets*, the facts alleged in the Amended Complaint demonstrate that Officer Chatterji reported in good faith his belief that the City was engaging in wasteful practices

23

concerning the information technology systems being used by the PBP, that he was threatened and discriminated against for making those reports, and that he ultimately suffered an adverse employment action because of them.  Those facts alone raise a reasonable inference of impropriety by the City that would require this Court to permit Officer Chatterji to conduct discovery over his claim.  *See Angelini v. U.S. Facilities, Inc.*, 2018 U.S. Dist. LEXIS 107615, *30-34 (E.D. Pa. June 27, 2018) (denying motion to dismiss whistleblower claim where defendant raised lack of temporal proximity because factual inferences supported plaintiff's claim and that issue is better-suited for summary judgment); *see also Bifano v. Waymart Borough*, 2016 U.S. Dist. LEXIS 177147, *37-44 (M.D. Pa. Dec. 22, 2016) (denying motion to dismiss whistleblower claim because factual allegations in complaint raised sufficient inferences that plaintiffs were retaliated against by borough and police chief for making good faith reports of waste, in violation of the whistleblower law).  Accordingly, this Court should deny the City's Motion to Dismiss.

## IV.   Conclusion

The facts alleged in the Amended Complaint reasonably state plausible claims for relief against the City for violating Officer Chatterji's rights under the Equal Protection Clause and the Whistleblower Law and, because of that, this Court should deny the City's Motion to Dismiss and allow this case to proceed to discovery.

Respectfully submitted,

/s/ Alec B. Wright
Alec B. Wright
Pa. ID No. 316657

Timothy P. O'Brien
Pa. ID No. 22104

239 Fourth Avenue
Investment Building, Suite 2103
Pittsburgh, Pennsylvania 15222
(412) 232-440

*Counsel for Plaintiff, Souroth Chatterji*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was served this 25th day of

July 2018 via this Court's CM/ECF electronic filing system upon all counsel of record.


/s/ Alec B. Wright_____
Alec B. Wright, Esquire
*Counsel for Plaintiff*