**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SOUROTH CHATTERJI, | : | No. 2:18-cv-00199-CB |
| | : | |
| Plaintiff, | : | *Electronically filed* |
| | : | |
| v. | : | |
| | : | |
| CITY OF PITTSBURGH and ASSISTANT | : | **JURY TRIAL DEMANDED** |
| CHIEF OF THE PITTSBURGH BUREAU | : | |
| OF POLICE LINDA BARONE, | : | |
| individually, | : | |
| | : | |
| Defendants. | : | |

**BRIEF IN OPPOSITION TO DEFENDANT
LINDA BARONE'S MOTION TO DISMISS**

Plaintiff Souroth Chatterji ("Officer Chatterji"), by his counsel, hereby files this Brief in Opposition to Defendant Linda Barone's ("Barone") Motion to Dismiss Amended Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Motion to Dismiss") (Doc. 28) as follows:

**I.     Introduction**

In 2015, Officer Chatterji—who is of Indian-descent—was ordered by former Chief of the Pittsburgh Bureau of Police (the "PBP") Cameron McClay ("Former Chief McLay") and Chief of Staff Commander Eric Holmes ("Chief of Staff Holmes") to become part of a work group within the PBP to audit the information technology systems it was utilizing. Pursuant to that audit, Officer Chatterji reported to Former Chief McLay and Chief of Staff Holmes his good faith understanding that the PBP had paid millions of dollars to B-Three Solutions, Inc. ("B-Three Solutions") for updates and upgrades to its information technology systems that the audit revealed were neither completed nor implemented. Despite scoring and qualifying number one overall for a promotion to the rank of sergeant in the PBP, Barone personally directed or influenced the decision that Officer Chatterji not be promoted to sergeant.

As discussed in detail below, Barone's personal involvement or influence—in her supervisory positions as the Deputy Director of the Department of Public Safety, the Assistant Chief of the Administration Bureau and the Assistant Chief of the PBP—over Officer Chatterji not being promoted to sergeant was motivated either because of his race or national origin (Indian), because of the audit, or both.

First, Officer Chatterji is the only officer in the PBP, which is comprised of nearly 850 officers, whose national origin is Indian. He is also the only officer not promoted to sergeant after qualifying number one overall for that promotion. Further, it is undisputed that he received different treatment from other similarly-situated individuals because at least eight patrol officers— none of whom are of Indian-descent—were promoted to sergeant over him despite scoring and ranking lower than him for the promotion. In connection with Officer Chatterji not being promoted to sergeant, Barone stated to the Director of the Department of Public Safety Wendell Hissrich ("Hissrich")[1] that Officer Chatterji scored number one overall for that promotion only because he was "Indian" and thus was given extra credit that "Americans" were not given. Barone also stated to Hissrich that Officer Chatterji should not be promoted because of his incompetence which in turn stemmed from his lack of understanding of "American ways." Those facts as alleged in the Amended Complaint reasonably demonstrate that Barone's (or Hissrich's) decision not to promote Officer Chatterji to sergeant was motivated by intentional racial animus.

The following facts also reasonably demonstrate that Barone's (or Hissrich's) decision not to promote Officer Chatterji to sergeant was in retaliation for his making a good faith report of waste to one of his superiors in connection with the PBP's information technology systems:

---

[1] As discussed in detail in Officer Chatterji's Brief in Opposition to the City's Motion to Dismiss (Doc. 26), Hissrich is one of two potential policymakers for promotions within the PBP for Defendant City of Pittsburgh (the "City"). The other is Barone.

- During and after the audit, Barone told Officer Chatterji, among other things, that:

  o "if he kept digging into B-Three Solutions, it would lead to his ruin;"

  o "chiefs come and go," referring to Former Chief McLay, and that he would ultimately be the one that suffered for auditing B-Three Solutions;

  o he is "done with the police department;"

  o he has "no future with the police department;" he "will never be promoted;" and

  o he "should find another job;"

- On numerous occasions during the audit, officers under Barone's direct control and supervision and who were aligned with Barone, including Officer Dawn Bowen ("Officer Bowen") and Sergeant Anthony Cortopassi ("Sergeant Cortopassi"), intimidated and pressured Officer Chatterji to terminate the audit on her behalf, stating to Officer Chatterji, among other things, that Former Chief McLay's administration was negatively affecting his "friends" at B-Three Solutions and that Officer Chatterji needed to stop the audit, or he would suffer;[2]

- Prior to Former Chief McLay's resignation, Officer Chatterji received the highest attainable levels in his performance reviews with the PBP; after his resignation, Officer Chatterji received lesser performance reviews than he received in the past because Barone negatively influenced his career with the PBP by using her position as both Assistant Chief of the PBP and Deputy Director of the Department of Public Safety;

- Barone negatively influenced Officer Chatterji's career by leveraging her relationship with Hissrich against him;

- Barone terminated Officer Chatterji's keycard access to the PBP's headquarters following Former Chief McLay's resignation and terminated Officer Chatterji's involvement in all PBP projects run out of headquarters;

- Officer Chatterji was advised by his lieutenant in Zone 2 that Barone ordered that he never speak about anything related to Barone or B-Three Solutions again;

---

[2] It was during these occasions that Officer Chatterji was also called "sandn*****" and "Haji" and told that no "brown person" like him should be promoted within the PBP.

- Despite scoring number one overall in the PBP for promotion to the rank of sergeant, Officer Chatterji was denied that promotion because of a baseless investigation with the City's Office of Municipal Investigations ("OMI") that Barone—who is the head of OMI—initiated against him;[3]

- Officer Chatterji learned that because of Barone's influence and intimidation tactics he did not even receive a recommendation for sergeant despite scoring number one overall;

- Through numerous communications, in person and otherwise, Barone told Hissrich not to promote Officer Chatterji because of the audit;

- On January 29, 2018, Barone ordered that Public Information Officer Alicia George ("PIO George") confront Officer Chatterji and tell him that his career with the PBP would be ruined unless he cooperated with Barone, which included signing a non-disclosure agreement relating to any information he learned about her and B-Three Solutions during the audit; and

- Barone continues to take overt steps to ruin Officer Chatterji's career with the PBP, including publicizing false and defamatory statements about him—such as calling him a liar and being untruthful—directly and indirectly threatening him, and attempting to discredit him by any means necessary.

As stated above, these facts reasonably demonstrate that Officer Chatterji was not promoted to sergeant either because of Barone's racial animus toward him, in retaliation for his good faith report of waste, or both. Indeed, it is well-established that Officer Chatterji may plead alternative or even inconsistent claims in the Amended Complaint. *See* F.R.C.P. 8(d)(2)-(3). These facts thus reasonably state plausible claims for relief against Barone under the Equal Protection Clause and Pennsylvania's Whistleblower Law, 43 Pa.C.S.A. § 1421, *et seq.* (the "Whistleblower Law") and this Court should permit discovery on those claims. Therefore, Barone's Motion to Dismiss should be denied.

---

[3] As indicated above, Officer Chatterji also learned that Barone told Hissrich that he was not promoted because of his incompetence due to his lack of understanding of "American ways."

4

## II.     Standard of Review

A complaint does not require "detailed factual allegations."  *See Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also* F.R.C.P. 8(a)(2).   "The touchstone of the pleading standard is plausibility."  *Bristrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Bristrian*, 696 F.3d at 365 (citation omitted); *see also Thompson v. Real Estate Mort. Network*, 748 F.3d 142, 147 (3d Cir. 2014) (stating that a plaintiff "need only put forth allegations that raise a reasonable expectation that discovery will reveal evidence of the necessary element") (citations omitted).  "[T]he facts alleged must be taken as true and a complaint may not be dismissed merely because it appears unlikely that the plaintiff can prove those facts or will ultimately prevail on the merits."  *Phillips*, 515 F.3d at 231 (citation omitted).

## III.    Argument

Barone's Motion to Dismiss reads more like an answer than it does a dispositive motion in that—like an answer—it merely denies the Amended Complaint's factual allegations and fails to articulate why those facts do not state plausible claims for relief.  To that end, Barone cherry-picks legal conclusions and does not challenge the well-pleaded factual allegations from which those legal conclusions may reasonably be inferred.  Barone thus moves to dismiss Officer Chatterji's claim that she violated his rights under the Equal Protection Clause by simply stating that legal conclusions alone cannot support that claim.   Barone—citing to the *former definition* of "employer" under the Whistleblower Law—also moves to dismiss that claim on the sole basis that she is not an "employer."  For the reasons that follow, both arguments fail.

A.      **The Amended Complaint states a plausible claim for relief against Barone for depriving Officer Chatterji of his rights under the Equal Protection Clause**

To establish a denial of equal protection under 42 U.S.C. § 1983, a plaintiff must prove the existence of purposeful discrimination—i.e., that he or she "received different treatment from that received by other individuals similarly situated." *See Keenan v. City of Phila.*, 983 F.2d 459, 465 (3d. Cir. 1992) (citation omitted).  "The elements of a valid § 1983 claim for denial of Equal Protection based on intentional racial animus are that: (1) the plaintiff belongs to a protected class; (2) the defendant acted under color of state law; and (3) the defendant treated plaintiff differently because of his race." *Adams v. City of Greensburg*, 2018 U.S. Dist. LEXIS 41688, *6-7 (W.D. Pa. March 14, 2018) (citation omitted).  "There are multiple ways for a plaintiff to prove such a claim, including through race-based comments that reveal a discriminatory motive underlying an adverse employment action." *Id.* at *7 (citation omitted); *see also Doe v. C.A.R.S. Prot. Plus*, 527 F.3d 358, 368-69 (holding that discriminatory remarks provide background evidence that may be critical to a jury's determination of whether the decision-maker was more likely than not acting out of a discriminatory motive) (3d Cir. 2008).

Individual liability under the Equal Protection Clause requires "personal involvement." *McCleester v. Mackel*, 2008 U.S. Dist. LEXIS 27505, *27 (W.D. Pa. March 27, 2008) (citing *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988)).  Personal involvement includes "allegations of personal direction or of actual knowledge and acquiescence." *Id.* (citations omitted); *see also Andrews v. Philadelphia*, 895 F.2d 1469, 1478-80 (3d Cir. 1990) (affirming jury verdict finding individual liability for violating employees' Equal Protection right under § 1983 because evidence established personal direction or actual knowledge and acquiescence).  Personal involvement can also include "proof of direct discrimination by the supervisor." *Andrews*, 895 F.2d at 1478.

"Generally speaking, where a § 1983 action is brought by one public employee against another person employed by the same entity, the alleged wrongdoer must occupy a supervisory position over the plaintiff in order to act under color of state law." *Id.* at *29 (citation omitted). "The question of whether a particular individual holds a 'supervisory position' over another must be answered by reference to the power that the individual actually holds, not by reference to his or her formal job title." *Id.* at *30 (citing *Bonenberger v. Plymouth Township*, 132 F.3d 20, 23 (3d Cir. 1997) (stating that there is no distinction between a formal title and one who nonetheless occupies that role). In determining whether a person hold a supervisory position, "a court must consider whether the defendant could alter the plaintiff's workload, or whether the plaintiff would face internal charges of insubordination for failing to adhere to the defendant's instructions." *Id.* at *30-31 (citing *Zelinksi v. Pennsylvania State Police*, 108 Fed.Appx. 700, 703 (3d Cir. 2004)). "**This issue of supervisory authority is a question of fact**." *Id.* (citation omitted) (emphasis added).

For all the reasons set forth in Officer Chatterji's Brief in Opposition to the City's Motion to Dismiss, Barone obviously had supervisory authority over Officer Chatterji. Barone's Motion to Dismiss fails to address this issue. Nevertheless, to the extent Barone is deemed to have not waived this issue, the facts alleged in the Amended Complaint demonstrate that Barone always held a supervisory position over Officer Chatterji because she could control his workload, *see* Doc 15, Amended Complaint, ¶ 91, could order others to give Officer Chatterji orders, *id.* at ¶¶ 67-73, 79-80, 91, 94, 100 and 115-116, could influence Officer Chatterji's performance reviews, *id.* at ¶ 89, and could cause internal charges of insubordination to be lodged against Officer Chatterji for

failing to adhere to her instructions, *id.* at ¶¶ 119-123.  To be sure, Barone was arguably the policymaker responsible for not to promoting Officer Chatterji to sergeant, *id.* at 79-87.[4]

Moreover, Officer Chatterji was merely a patrol officer at the mercy of the PBP's chain of command, *id.* at ¶ 13.  At various times, Barone used her position in the chain of command as a Commander in the PBP to make direct and indirect threats to Officer Chatterji concerning his employment, *id.* at ¶¶ 63-77.  At other times, Barone simultaneously held positions both subordinate and supervisory to the Chief of the PBP, *id.* at ¶ 80, and similarly used those positions to negatively influence and control Officer Chatterji's employment, *see e.g., id.* at ¶¶ 88-94, 97-103, 106-107, 115-116 and 120-123.

Barone's Motion to Dismiss also does not address the Amended Complaint's detailed factual allegations concerning her personal involvement in the decision not to promote Officer Chatterji—a decision which is alleged to have been motivated by intentional racial animus toward him.[5]  Consideration must be given to those allegations where Barone—as Assistant Chief of the PBP, Deputy Director of the Department of Public Safety and Assistant Chief of the Administration Bureau—is alleged to be the person responsible for not promoting Officer Chatterji.  And, factual allegations that Officer Chatterji, as the only officer in the PBP of Indian-descent (out of nearly 850 officers), questioned and reported wasteful practices within the PBP

---

[4] Barone also clearly exercised authority over him by stating that, among other things, "if he kept digging into B-Three Solutions, it would lead to his ruin," "chiefs come and go," referring to Former Chief McLay, and that he would ultimately be the one that suffered for auditing B-Three Solutions, he is "done with the police department," he has "no future with the police department;" he "will never be promoted;" and he "should find another job," *id.* at ¶¶ 64-65, 67-71 and 92.

[5] Barone's entire argument to dismiss the Equal Protection Claim apparently centers on *Innovative Polymer Techs., LLC v. Innovation Works, Inc.*, 2018 U.S. Dist. LEXIS 58643 (W.D. Pa. April 6, 2018), which has no factual or legal similarities to this case.  *Innovative Polymer* is nothing more than a case dealing in part with the Equal Protection Clause.  *Innovative Polymer* is at best parenthetical support for Barone's argument.

directly relating to Barone, must also be considered.  In that regard, this Court must accept the following facts in the Amended Complaint as true, even if none of them are addressed in Barone's Motion to Dismiss:

- During the audit of the PBP's information technology systems, suspicions had arisen regarding Barone's relationship with B-Three Solutions and her role in providing B-Three Solutions with a sole source contract in 2006 that allowed it to monopolize those systems, *id.* at ¶ 51;

- At all relevant times, Barone was aware that Officer Chatterji was auditing B-Three Solutions, *id.* at ¶ 53;

- At all relevant times, Hissrich updated Barone on all progressions and findings of the audit, *id.* at ¶ 55;

- Throughout the time that Officer Chatterji was auditing B-Three Solutions, he was subject to various direct and indirect threats by Barone, *id.* at ¶ 63;

- On numerous occasions, officers under Barone's direct control and supervision and who were aligned with Barone intimidated and pressured Officer Chatterji because of the audit, *id.* at ¶ 67;

- Barone had knowledge of and acquiesced in the way the officers under her direct control and supervision went about intimidating and pressuring Officer Chatterji to terminate the audit, *id.* at ¶ 68;

  o Those officers, in addition to Alexis Barone—Barone's daughter—called Officer Chatterji a "sandn*****" and "Haji," *id.* at ¶ 72;

  o Those officers, in addition to Alexis Barone, discussed how no "brown person" like Officer Chatterji should be promoted within the PBP, *id.* at ¶ 73;

- Barone (and Hissrich) was made aware of these derogatory and racist remarks about Officer Chatterji and not only failed to take any substantive action to address or stop them from reoccurring, but also ratified such remarks, *id.* at ¶¶ 74-75;

- Barone (and Hissrich) was made aware that at least one of those officers continues to make derogatory and racist remarks about Officer Chatterji through computer and internet chat rooms that are frequented by supervisors and decisionmakers in the PBP by calling him "Muhammed" and "Chatter Teeth," and stating that Officer Chatterji cannot display his military service to others because he is not "American," *id.* at ¶¶ 76-77;

- Following Former Chief McLay's resignation, Barone caused Officer Chatterji to receive lesser performance reviews than he had in the past (which were always at the highest attainable levels), *id.* at ¶¶ 88-89;

- Following Former Chief McLay's resignation, Barone terminated Officer Chatterji's keycard access to the PBP's headquarters, as well as all involvement he had with projects run out of headquarters, *id.* at ¶ 91;

- Officer Chatterji became the number one overall ranking candidate in the PBP for promotion to sergeant, *id.* at ¶¶ 95-96;

- On November 20, 2017, despite scoring number one overall, Officer Chatterji was told that Barone had ordered that he not be promoted to sergeant, *id.* at ¶ 97;

- No patrol officer within the PBP has scored number one overall and not been promoted to sergeant, *id.* at ¶ 98;

- Officer Chatterji learned that, because of Barone's influence, he did not even receive a recommendation for sergeant, *id.* at ¶ 100;

- In connection with not receiving the promotion to sergeant, Barone told Hissrich and others that Officer Chatterji only scored number one overall because he was "Indian" and thus was given extra credit that "Americans" were not given, *id.* at ¶ 106;

- In connection with not receiving the promotion to sergeant, Barone told Hissrich and others that Officer Chatterji was not promoted because of his incompetence because of his lack of understanding of "American ways," *id.* at ¶ 107;

- Hissrich adopted the racially discriminatory comments that Barone made about Officer Chatterji because he did not want an officer of Indian-descent questioning any decisions that had been or were being made by the City or the PBP, *id.* at ¶ 108;

- In addition to his being the only officer of Indian-descent in the PBP, Officer Chatterji is the first immigrant to serve in the PBP in over a decade, and the first ever immigrant officer of Indian-descent to rank number one overall for promotion to the rank of sergeant, *id.* at ¶¶ 109-112;

- On January 29, 2018, Barone ordered that Public Information Officer Alicia George ("PIO George") confront Officer Chatterji about auditing B-Three Solutions and get him to sign a non-disclosure agreement or else his career be ruined, *id.* at ¶¶ 115-116;

- As of May 2018, at least eight patrol officers were promoted to the rank of sergeant that scored below Officer Chatterji, none of whom are of Indian-descent, *id.* at ¶ 117; and

- Hissrich had authorized Barone—who oversees OMI as appointed by Hissrich—to initiate a baseless OMI complaint against Officer Chatterji as a means of discrediting him and providing a reason for not promoting him, *id.* at ¶¶ 119-121.

From all these facts it may reasonably be inferred that the decision not to promote Officer Chatterji to sergeant was motivated by intentional discriminatory animus—whether because of the simple fact that Officer Chatterji is of Indian-descent, because Barone did not want a patrol officer of Indian-descent questioning her or the PBP, or both. These facts clearly detail Barone's personal involvement in the decision not to promote Officer Chatterji to sergeant. Certainly, this Court cannot overlook the factual allegation that Barone *admitted* that Officer Chatterji was not promoted to sergeant because of his incompetence due to his lack of understanding of "American ways."

At this early stage, these facts sufficiently allege how Barone was personally involved in the decision not to promote Officer Chatterji and that her involvement in that decision was motivated at least in part by his race or national origin. In addition to Barone's statements or admissions demonstrating racial animus—namely, Barone's statements that Officer Chatterji only scored number one overall because he was "Indian" and thus was given extra credit that "Americans" were not given, and that he was not promoted due to his incompetence because of his lack of understanding of "American ways"—this Court should not overlook the undisputed fact that eight patrol officers that scored below Officer Chatterji were promoted to sergeant and none of them were of Indian-descent. For all these reasons, this Court should deny Barone's Motion to Dismiss.

**B.**     **The Amended Complaint states a plausible claim for relief against Barone under the Whistleblower Law**

The gravamen of Officer Chatterji's claim against Barone under the Whistleblower Law is that she discriminated, threatened and/or retaliated against him for making a good faith report of *waste of funds* to his superiors in the PBP that implicated her involvement in that waste of funds. Barone does not dispute the basis for this claim in her Motion to Dismiss.  Instead, Barone—citing to the *former definition* of "employer" under the Whistleblower Law—merely contends that Officer Chatterji's claim fails because she is not an "employer."  That argument misapprehends the Whistleblower Law's plain language of the amended definition of "employer," which obviously contemplates individual liability against employees of a public body or those individuals who receive money from a public body to perform work or provide services.

Under the Whistleblower Law:

> No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

*Id.* at § 1423.[6]

A "whistleblower" is defined as a "person who witnesses or has evidence of wrongdoing or waste while employed and who makes a good faith report of the wrongdoing or waste, verbally or in writing, to one of the person's superiors, to an agent of the employer or to an appropriate authority."  43 Pa.C.S.A. § 1422 (emphasis added).  "Waste" is defined as an "employer's conduct or omissions which result in substantial abuse, misuse, destruction or loss of funds or resources

---

[6] "An employee alleging a violation of this act must show by a preponderance of the evidence that, prior to the alleged reprisal, the employee or a person acting on behalf of the employee had reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority."  *Id.* at § 1424(b).

belonging to or derived from Commonwealth or political subdivision sources." *Id.* "Good faith report" is defined as a "report of conduct defined in this act as wrongdoing or waste which is made without malice or consideration of personal benefit and which the person making the report has reasonable cause to believe is true." *Id.*

The Whistleblower Law plainly defines an "employer," in part, as an "**individual**" who "**receives money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body**." *Id.* (emphasis added). The definition of "public body" include cities and its departments. *Id.* The definition of "public body" also includes "[a]ny other body which is created by … political subdivision authority … **or employee of that body**." *Id.* (emphasis added).

As stated above, Barone's Motion to Dismiss only challenges whether she is an "employer" under the Whistleblower Law.  The Whistleblower Law clearly establishes that an "employer" includes city employees or employees of any other body that is created by a political subdivision. *See* 42 Pa.C.S.A. § 1422.  That Law also clearly establishes that individuals (like Barone) who receive money from a public body (like the City) to perform work or provide services to that public body, may not threaten or otherwise discriminate or retaliate against an employee (like Officer Chatterji) for making a good faith report of waste.  *See* 43 Pa.C.S.A. §§ 1422 and 1423; *see also Bailets v. Pa. Tpk. Comm'n*, 123 A.3d 300 (Pa. 2015) (reversing summary judgment that was granted to Pennsylvania Turnpike Commission and related officials who were sued in their individual capacities); *Bifano v. Waymart Borough*, 2016 U.S. Dist. LEXIS 177147, *37-44 (M.D. Pa. Dec. 22, 2016) (denying motion to dismiss whistleblower claim because factual allegations in complaint raised sufficient inferences that plaintiffs were retaliated against by borough and police chief for making good faith reports of waste, in violation of the whistleblower law).

13

Barone undoubtedly received money from the City to perform work or provide services to it in her capacities as Commander, Assistant Chief of the PBP, Deputy Director of the Department of Public Safety and Assistant Chief of the Administration Bureau, *see* Doc. 15, ¶ 9. Also, Barone is clearly an employee of the City and the PBP, which are public bodies. *See id.* It should be beyond factual debate at this early stage that Barone—in her various capacities as Commander, Assistant Chief of the PBP, Deputy Director of the Department of Public Safety and Assistant Chief of the Administration Bureau—threatened, retaliated and otherwise discriminated against Officer Chatterji for making a good faith report of waste to his superiors in the PBP:

- In early 2015, Officer Chatterji was transferred to the PBP's headquarters to work with Former Chief McLay and Chief of Staff Holmes as part of a work group to explore how the PBP could upgrade its information technology systems, *id.* at ¶ 14;

- As part of this work group, Officer Chatterji was ordered by Former Chief McLay to audit the information technology systems being utilized by the PBP and to report all results of the audit to him and Chief of Staff Holmes, *id.* at ¶ 15;

- As the audit progressed, around October 2015, Former Chief McLay and Chief of Staff Holmes tasked Officer Chatterji with gathering information on a new "Report Management System" (known as an "RMS System") and an update to the computer-aided dispatch system (known as a "CAD System") being used by the PBP, *id.* at ¶ 16;

- Specifically, Former Chief McLay and Chief of Staff Holmes tasked Officer Chatterji with gathering information on RMS and CAD Systems that had been created by TriTech Software Systems, formerly known as Tiburon ("Tiburon"), *id.* at ¶ 17;

- Former Chief McLay and Chief of Staff Holmes also tasked Officer Chatterji with gathering information on the National Crime Information Center terminal (known as "NCIC") and the RMS System that was already being used by the PBP, which included an NCIC terminal that had been created by Motorola Premier and an RMS System called the Automated Police Reports System (known as "APRS") that had been created by B-Three Solutions, *id.* at ¶ 18;

- The purpose of the audit was two-fold: (i) compare the PBP's current RMS System, APRS by B-Three Solutions, with the Tiburon RMS System, and (ii) compare the PBP's current NCIC terminal, created by Motorola Premier, which worked in conjunction with the APRS, with the upgraded Tiburon CAD System, *id.* at 19;

- The goal was to audit the PBP's information technology systems for areas of improvement in data collection and automation, *id.* at ¶ 20;

- Through the audit, Officer Chatterji learned and reported information to Former Chief McLay and Chief of Staff Holmes that, among other things:

  o the updated CAD system could be updated for free and had a significantly higher level of functionality than the version that was being used by the PBP, and was compatible with Tiburon's RMS System, which had a significantly higher level of functionality than the RMS System by B-Three Solutions, *id.* at ¶ 21;

  o the Tiburon RMS System was compliant with the National Incident-Based System ("NIBRS"), which is an incident-based reporting system used by law enforcement agencies in the United States for collecting and reporting crime data, *id.* at ¶ 22, while the APRS by B-Three Solutions was neither NIBRS compliant nor usable for accurate crime data reporting, *id.* at ¶ 23;[7]

  o the system that B-Three Solutions had implemented for producing documentation for an officer's daily activities (known as "daily activity sheets") was comprised of multiple screen shots only and no source code, *id.* at ¶ 29, meaning that officer's daily activities could not be automated into daily activity sheets, *id.* at ¶¶ 30-31;

  o the PBP paid $110,000 to B-Three Solutions to automate the daily activity sheets in 2014, which was still not functional as of the date of the audit, *id.* at ¶ 32;

  o in 2012, the PBP paid B-Three Solutions $150,000 to automate and standardize the chain of custody process for property and evidence seized by the PBP through a system known as "Evidence Barcoding," but that system was never implemented, *id.* at ¶¶ 35-36;

---

[7] Officer Chatterji learned and reported that the Tiburon RMS System not only provided an obviously better cost-point for the PBP, but that it also significantly increased officer safety through automation and interfaced with law enforcement on a national basis. *Id.* at ¶ 24.

- o in 2011, the PBP paid B-three Solutions $75,000 to automate and streamline the "Confidential Report Systems," but it was never automated, *id.* at ¶¶ 37-39;

- o the PBP was paying B-Three Solutions $300,000 per year for annual software maintenance which would have been free from a different RMS provider, *id.* at ¶ 40;

- o B-Three Solutions was charging the PBP separately for matters that ordinarily would have been included in a subscription for annual software maintenance, *id.* at ¶ 41;

- o in total, the PBP had paid B-Three Solutions over $1,000,000 for technology upgrades and updates that were either not completed, could have been performed by other companies at much lower cost (if not for free), or were inferior in comparison to industry standards, *id.* at ¶ 42;

- because of the information revealed through the audit, suspicions arose around Barone and her relationship with B-Three Solutions because of her role in providing B-Three Solutions with a sole source contract in 2006 that allowed it to monopolize the PBP's information technology systems, *id.* at ¶ 51-52;

- at all relevant times, Barone was aware that she and B-Three Solutions were being audited/investigated, *id.* at ¶ 53;

- the Director of the Department of Public Safety, Wendell Hissrich ("Hissrich"), who subsequently appointed Barone to her decision-making positions within the PBP, *id.* at ¶ 79, kept Barone apprised on all progressions and findings of the audit so that she could retaliate against Officer Chatterji for the audit, *id.* at ¶ 55;

- at all relevant times, Hissrich and Barone were aware that technology upgrades and updates by B-Three Solutions were either not completed, could have been performed by other companies at much lower cost (if not for free), or were inferior in comparison to industry standards, *id.* at ¶ 56;

- following the audit of B-Three Solutions, numerous decisionmakers for the City admitted the accuracy of Officer Chatterji's findings, including Hissrich, *id.* at ¶ 60;

16

- following the audit, the City's Council passed a resolution changing the way requests for proposals are received and analyzed by the City, intending not to allow companies like B-Three Solutions to obtain monopolies over the City's contracts and services, such as the one that Barone provided to B-Three Solutions, *id.* at ¶ 61;

- this change was a direct result of the findings from the audit, *id.* at ¶ 62;

- throughout the time that Officer Chatterji was auditing B-Three Solutions and after the audit stopped, he was subjected to various direct and indirect threats by Barone, including:

  o during one meeting, Barone told Officer Chatterji that "if he kept digging into B-Three Solutions, it would lead to his ruin," *id.* at ¶ 64;

  o Barone told Officer Chatterji that "chiefs come and go," referring to Former Chief McLay, and that he would ultimately be the one that suffered for auditing B-Three Solutions, *id.* at ¶ 65;

  o on numerous occasions, officers under Barone's direct control and supervision and who were aligned with Barone intimidated and pressured Officer Chatterji to terminate the audit on her behalf, stating to Officer Chatterji, among other things, that Former Chief McLay's administration was negatively affecting their "friends" at B-Three Solutions and that Officer Chatterji needed to stop the audit, or he would suffer, *id.* at ¶¶ 67-71;

  o after the audit, Barone told Officer Chatterji that he is "done with the police department," he has "no future with the police department," he "'will never be promoted," and he "'should find another job," *id.* at ¶ 92;

- in 2017, Officer Chatterji became the number one overall qualified candidate for promotion to sergeant in the PBP, *id.* at ¶ 95-96;

- in her simultaneous positions as the Deputy Director of the Department of Public Safety, Assistant Chief of the PBP and Assistant Chief of the Administration Bureau, Barone is the second highest ranking official in the PBP, after Hissrich. *Id.* at 79-87;

- on November 20, 2017, despite scoring number one overall, Barone ordered that Officer Chatterji not be promoted to sergeant because of a baseless investigation that she had initiated with OMI against Officer Chatterji with respect to the audit, *id.* at ¶ 97;

- no patrol officer within the PBP has scored number one overall and not been promoted to sergeant, *id*. at ¶ 98, and officers within the PBP who have been under investigation by OMI, even for meritorious claims, have been promoted if they otherwise qualified for that promotion, *id.* at ¶ 99;

- as of May 2018, least eight patrol officers were promoted to the rank of sergeant that scored below Officer Chatterji, *id.* at ¶ 117;

- Barone either personally directed or directly influenced the decision not to promote Officer Chatterji based on the following factual circumstances, among others:

  o prior to Former Chief McLay's resignation, Officer Chatterji received the highest attainable levels in his performance reviews with the PBP; after his resignation, Officer Chatterji received lesser performance reviews than he received in the past because Barone negatively influenced his career with the PBP by using her position as both Assistant Chief of the PBP and Deputy Director of the Department of Public Safety, *id.* at ¶¶ 88-89;

  o Barone negatively influenced Officer Chatterji's career by leveraging her relationship with Hissrich against him, *id.* at ¶ 90;

  o Barone terminated Officer Chatterji's keycard access to the PBP's headquarters following Former Chief McLay's resignation and terminated Officer Chatterji's involvement in all PBP projects run out of headquarters, *id.* at ¶ 91;

  o Officer Chatterji was advised by his lieutenant in Zone 2 that Barone ordered that he never speak about anything related to Barone or B-Three Solutions again, *id.* at ¶ 94;

  o Barone ordered that Officer Chatterji not be promoted to sergeant because of a baseless investigation that she had initiated against Officer Chatterji with the Office of Municipal Investigations ("OMI")—an office within the City that she manages and supervises, *id.* at ¶¶ 85-86 and 97;

  o Officer Chatterji learned that because of Barone's influence and intimidation tactics he did not even receive a recommendation for sergeant despite scoring number one overall, *id.* at ¶ 100;

  o through numerous communications, in person and otherwise, Barone told Hissrich not to promote Officer Chatterji because of the audit, *id.* at ¶ 103;

o   On January 29, 2018, Barone ordered that Public Information Officer Alicia George ("PIO George") confront Officer Chatterji and tell him that his career with the PBP would be ruined unless he cooperated with Barone, which included signing a non-disclosure agreement relating to any information he learned about her and B-Three Solutions during the audit, *id.* at ¶ 116; and

o   Barone continues to take overt steps to ruin Officer Chatterji's career with the PBP, including publicizing false and defamatory statements about him—such as calling him a liar and being untruthful—directly and indirectly threatening him, and attempting to discredit him by any means necessary, *id.* at ¶¶ 121-123.

This Court must accept all these facts as true at this early stage. All these facts, as stated above, clearly demonstrate that Barone—at various times as an employee of the City and the PBP—threatened, retaliated and otherwise discriminated against Officer Chatterji for making a good faith report of waste to his superiors in the PBP. At a minimum, even without the benefit of discovery, it may reasonably be inferred from these facts that Barone violated Officer Chatterji's rights under the Whistleblower Law.

The only case cited by Barone to support the dismissal of this claim is her unfounded reliance on *Retenauer v. Flaherty*, 642 A.2d 587 (Pa. Cmmw. 1994). *Retenauer* is readily distinguishable for at least two glaring reasons. First, *Retenauer* was analyzed under the former definition of "employer." *See id.* at 591 (citing the Whistleblower Law's definition of "employer" as "[a] person supervising one or more employees, including the employee in question; a superior of that supervisor; or an agent of public body"). As cited above, "employer" is defined in part as an "individual" who "receives money from a public body to perform work or provide services relative to the performance of work for or the provision of services to a public body." 43 Pa.C.S.A. § 1422 (emphasis added); *see also* Amendment Notes to 43 Pa.C.S.A. § 1422 (stating that the 2014 amendment by Act 2014-87 rewrote the definition of "Employer"). "Employer" is also defined as a "public body," which is defined in part as "[a]ny other body which is created by … political

19

subdivision authority … or employee of that body." *See id.*  Under these definitions, Barone is easily considered an "employer" under the Whistleblower Law.

And second, the decision in *Retenauer* was about indemnification and the payment of a money judgment against an individual public employee who a jury found liable for violating the Whistleblower Law.  Indeed, the jury in *Retenauer* returned a verdict in favor of the plaintiff employee and against City of Pittsburgh officials and the subsequent legal question on appeal in that case was merely determining who was going to pay that verdict to the plaintiff employee. *Id.* at 589-90.  That is simply not the issue here.

Barone does not cite *Bailets v. Pa. Tpk. Comm'n*, 123 A.3d 300 (Pa. 2015), which is a summary judgment case concerning the Whistleblower Law that is analogous and instructive for this Court.  In *Bailets*, the plaintiff was employed by the Pennsylvania Turnpike Commission from 1998 to 2008 and, during that time, complained frequently about improprieties and wasteful practices that he observed including—among other things—those relating to the Commission's computer systems contract with a third-party vendor.  123 A.3d at 301.  There, the plaintiff complained to a supervisor and a co-worker (who later became his superior) about these wasteful practices and the deficiencies in the performance of the computer system and that a contracted-for knowledge transfer of the computer systems never occurred. *Id.* at 301-02.  During that time, the supervisor and co-worker told the plaintiff that "[he] should not say anything about it," warned him "not to make waves or [his] job will be in jeopardy," and told him to "tread lightly." *Id.* (internal quotations omitted).  In June 2008, the plaintiff's job title and responsibilities were changed, and he was removed from an additional position he had held. *Id.*  He was terminated in November 2008 and thereafter filed suit against the Commission and the two individuals to whom he reported.

Ultimately, the Pennsylvania Supreme Court in *Bailets* rejected the defendants' argument that there was no causal connection between the plaintiff's initial report in March 2007 and his termination in November 2008.  *Id.* at 306.  The Court thus denied summary judgment to the defendants—including the individual defendants.  *Id.* at 310.  The Court subsequently upheld the Commonwealth Court's order entering judgment on a $3.2 million verdict in favor of the plaintiff. *See Bailets v. Pa. Tpk. Comm'n*, 2018 Pa. LEXIS 1498 (Pa. March 27, 2018).

Here, like in *Bailets*, the facts alleged in the Amended Complaint demonstrate that Officer Chatterji reported in good faith his belief that the City was engaging in wasteful practices concerning the information technology systems being used by the PBP, that Barone directly or indirectly threatened and discriminated against him for making those reports, and that Barone ultimately caused him to suffer an adverse employment action because of the reports.  The obvious inference from the Amended Complaint's factual allegations is that Barone violated Officer Chatterji's rights under the Whistleblower Law.  Officer Chatterji should thus be permitted to conduct discovery over his claim against Barone and this Court should deny her Motion to Dismiss.

**IV.    Conclusion**

The facts alleged in the Amended Complaint reasonably state plausible claims for relief against Barone for violating Officer Chatterji's rights under the Equal Protection Clause and the Whistleblower Law and, because of that, this Court should deny Barone's Motion to Dismiss and allow this case to proceed to discovery.

Respectfully submitted,

/s/ Alec B. Wright
Alec B. Wright
Pa. ID No. 316657

Timothy P. O'Brien
Pa. ID No. 22104

239 Fourth Avenue
Investment Building, Suite 2103
Pittsburgh, Pennsylvania 15222
(412) 232-440

*Counsel for Plaintiff, Souroth Chatterji*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served this 25th day of

July 2018 via this Court's CM/ECF electronic filing system upon all counsel of record.


/s/ Alec B. Wright
Alec B. Wright, Esquire
*Counsel for Plaintiff*

23